## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARTIN JOHNSON and JANE DOE on behalf of themselves and all others similarly situated, | Civil Action No.: 21-1214 |
| *Plaintiffs*, | |
| v. | September 13, 2021 |
| FRANK KENDALL, Secretary of the Air Force, | |
| *Defendant*. | |

## <u>COMPLAINT</u>

1.      Every day, men and women who joined the Air Force to serve their country struggle with the invisible wounds of their service. Rather than recognizing the effects of their military trauma and honoring these veterans for their sacrifices, the Air Force punishes them for their suffering. The Air Force forcibly separates countless veterans from the military with less-than-Honorable discharges due to minor infractions, and refuses to acknowledge that their mental health or sexual trauma played a role in shaping their conduct. These veterans are forever stigmatized, rejected from jobs, and barred from benefits like education and healthcare due to their discharge status. And it is the Air Force's most marginalized members—airmen of color and women—who disproportionately experience this punishment.

2.      Congress established the Discharge Review Boards (DRBs) to allow veterans to seek relief when they have been improperly and inequitably discharged. As more scientific evidence about mental health and sexual violence has emerged, military leadership and Congress

have recognized that these experiences can cause misconduct, and that military discharges must be considered in light of these experiences.

3.      In 2014, the Secretary of Defense directed records-correction boards to give "special consideration" to post-traumatic stress disorder (PTSD) diagnoses by the U.S. Department of Veterans Affairs (VA) and "liberal consideration" to civilian providers' PTSD diagnoses when reviewing discharge upgrade applications. Then, in 2016, Congress codified the "liberal consideration" standard into statute. The next year, the Department of Defense (DoD) declared that liberal consideration should be given to veterans petitioning for discharge relief on the basis of all mental health conditions, including PTSD, or experiences of military sexual trauma (MST). DoD has subsequently issued additional guidance requiring the boards to consider several factors "to ensure fundamental fairness" when making discharge upgrade determinations.

4.      Yet binding agency guidance, lawsuits challenging the failure of the Army and Navy to comply with these laws, and clear congressional intent have all failed to shake the Air Force Discharge Review Board's (AFDRB) entrenched skepticism of veterans' mental health claims and experiences of sexual or intimate partner violence (IPV). The Air Force consistently refuses to apply the liberal consideration standard and rejects hundreds of meritorious claims annually, frequently without explaining what a veteran must show to prevail or why their claims failed. In place of actual reasoning, the Air Force deploys boilerplate language to reject their claims.

5.      Through this process, veterans who have survived trauma, abuse, and combat learn that they will forever be defined by their lowest moments through standardized phrases that exemplify the AFDRB's suspicion of mental health claims and disregard for the case-by-case

2

demands of liberal consideration. Jane Doe and Martin Johnson thus bring this class action on behalf of themselves and other Air Force veterans with less-than-Honorable discharges.

6.      Jane Doe, a young Black woman, enlisted in the Air Force to provide for her family. Ms. Doe initially served as an excellent airwoman, inspiring those around her. Sadly, she was raped and she fell victim to IPV at the hands of a fellow airman, suffering physical and emotional abuse. Ms. Doe continued to train and serve, but PTSD arising from sexual and intimate partner abuse led to her separation with a General (Under Honorable Conditions) discharge for minor misconduct. In assessing her misconduct, the Air Force ignored the significant mental health conditions and IPV she endured, reflecting its underlying suspicion of these claims and their impact.

7.      In 2020, Ms. Doe applied for a discharge upgrade after recognizing that PTSD caused the minor misconduct for which she was discharged. Despite ample medical and lay evidence presented by her *pro bono* counsel, the AFDRB and the Board's psychiatrist questioned the veracity of her PTSD diagnosis during her hearing. Two weeks later, Ms. Doe received the same form rejection notice that over 60 percent of AFDRB applicants receive.

8.      Martin Johnson enlisted in the military as a young Black man after high school. His initial period in service was difficult, but Mr. Johnson rose to the challenge. Within a matter of months, Mr. Johnson went from receiving numerous reprimands to being described by the same officers who initially punished him as a "born leader." He received award after award and was recommended for promotion. His tour in Iraq, however, left him with mental scars that affect him to this day. These experiences were compounded by personal family issues that left Mr. Johnson with PTSD, major depressive disorder, social anxiety disorder, and other trauma. And yet, the Air

3

Force disregarded Mr. Johnson's improvements as an airman and his mental trauma when it separated him with a General (Under Honorable Conditions) discharge for minor infractions.

9.     The AFDRB continued to ignore these critical pieces of information and Mr. Johnson's post-service treatment for PTSD when they denied his request for an Honorable discharge. Mr. Johnson was also represented by *pro bono* counsel throughout his proceedings. He presented substantial documentary and testimonial evidence to demonstrate that his misconduct was mitigated by in-service trauma. The AFDRB summarily rejected his application, employing similar boilerplate, undifferentiated language as in other application denials. Today, Mr. Johnson continues to bear the weight of a less-than-Honorable discharge rating.

10.     By issuing arbitrary and capricious and discriminatory decisions, the AFDRB violates the Administrative Procedure Act (APA), DoD guidance, the Due Process Clause of the Fifth Amendment, and Section 504 of the Rehabilitation Act. On behalf of themselves and others similarly situated, Ms. Doe and Mr. Johnson ask the Court to set aside and hold unlawful the AFDRB's improper denials of discharge upgrade applications. They request that this Court order the AFDRB to review their discharge upgrade applications again and meaningfully apply the liberal consideration standard. Finally, Ms. Doe and Mr. Johnson ask the Court to issue injunctive relief to ensure that Air Force veterans may have their discharge upgrade applications considered according to the Constitution and as intended by Congress and the Department of Defense.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331. This action arises under the APA, 5 U.S.C. § 706; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Due Process Clause of the Fifth Amendment.

12.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C), as Plaintiff Doe resides in the District of Connecticut, no real property is involved in the action, and Defendant Frank Kendall is sued in his official capacity as an officer of the United States.

## PARTIES

13.     Plaintiff Jane Doe is a veteran of the United States Air Force. She is a citizen of the United States and resides in Connecticut.

14.     Plaintiff Martin Johnson is a veteran of the United States Air Force. He is a citizen of the United States and resides in Massachusetts.

15.     Defendant Frank Kendall, Secretary of the Air Force, is sued here in his official capacity. Congress has authorized the Secretary of the Air Force, acting through the AFDRB, to correct the improper or inequitable discharge of any former member of the Air Force who was not discharged by a general court-martial. 10 U.S.C. § 1553(a); 32 C.F.R § 70.9.

## REGULATORY BACKGROUND

16.     Upon discharge from the U.S. Armed Forces, military personnel receive a certificate that characterizes their service. Common characterizations for post-9/11 servicemembers are Honorable, General (Under Honorable Conditions), Other than Honorable, Bad Conduct, and Dishonorable.

17.      The discharge characterization affects each veteran's eligibility for benefits and support services administered by the VA, *see, e.g.*, 38 U.S.C. § 101(2); 38 C.F.R. § 3.12, as well as benefits and services provided by state laws.

18.     To receive VA education benefits and services through the Post-9/11 GI Bill program, a veteran must receive an Honorable discharge or be discharged or released for a service-connected disability. 38 U.S.C. §§ 3311(b)–(c).

5

19.     Congress has authorized the Secretary of the Air Force, acting through the AFDRB, to correct the improper or inequitable discharge of any former member of the Air Force not discharged by sentence of a general court-martial. 10 U.S.C. § 1553; 32 C.F.R. § 70.9.

20.     On September 3, 2014, then-Secretary of Defense Chuck Hagel issued a memorandum (the "Hagel Memo") directing military review boards to give "special consideration" to PTSD diagnoses by the VA and "liberal consideration" to diagnoses of PTSD by civilian providers when adjudicating discharge upgrade applications submitted by veterans who have been diagnosed with PTSD. Ex. 1, Hagel Memo.

21.     The Hagel Memo also directs military boards to consider PTSD and "PTSD-related conditions" as "potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service." *Id.*

22.     In 2016, Congress codified parts of the Hagel Memo. The DRBs are now statutorily required to grant liberal consideration to the discharge upgrade applications of veterans with symptoms related to PTSD or traumatic brain injury (TBI). 10 U.S.C. § 1553(d)(3)(A)(ii). In particular, the DRBs are mandated to review each case "with liberal consideration to the former member that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge of a lesser characterization." *Id.* Congress further clarified that the Hagel Memo's requirements also applied to applicants whose PTSD or TBI is "based in whole or in part on sexual trauma, intimate partner violence, or spousal abuse." 10 U.S.C. § 1553(d)(1)(B).

23.     On August 25, 2017, citing a determination "that clarifications are needed regarding" the Hagel Memo's application, then-Acting Under Secretary of Defense for Personnel and Readiness Anthony M. Kurta issued additional guidance (the "Kurta Memo") clarifying that

"[l]iberal consideration will be given to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions . . . ; sexual assault; or sexual harassment." Ex. 2, Kurta Memo.

24.     Almost one year later, on July 25, 2018, then-Under Secretary of Defense for Personnel and Readiness Robert L. Wilkie issued yet another memorandum (the "Wilkie Memo") clarifying the mitigating factors the DRBs must consider in order "to ensure fundamental fairness" when making discharge upgrade decisions. The Wilkie Memo explained that whenever there is insufficient evidence to warrant relief for an error or impropriety, "requests for relief based in whole or in part on a mental health condition, including post-traumatic stress disorder (PTSD); Traumatic Brain Injury (TBI); or a sexual assault or sexual harassment experience, should be considered for relief on equitable, injustice, or clemency grounds." Ex. 3, Wilkie Memo. The Memo also requires the DRBs to consider factors such as the applicant's candor, whether the applicant accepts responsibility for their misconduct, the applicant's character references, and the applicant's conduct after their discharge. *Id.* The Wilkie Memo emphasizes the value of rehabilitation over accomplishment, and it recognizes that a veteran's service does not have to be flawless to be considered Honorable. *Id.*

25.     The AFDRB must respond to all issues relevant to the decision of whether to change the character of or reason for discharge. 32 C.F.R. § 70.8(d); DoD Instruction 1332.28, Discharge Review Board Procedures and Standards (Apr. 4, 2004) [hereinafter "DODI 1332.28"].

26.     When the AFDRB makes a factual determination after considering contradictory evidence in the record, it must explain in its decision "why the information relied upon was more persuasive than the information that was rejected." DODI 1332.8 at § E3.5.3.2.2.2.

27.     The AFDRB applies a "presumption of regularity in the conduct of governmental affairs," which can be overcome by "substantial credible evidence." *Id.* at § E3.2.12.6.

28.     When the AFDRB decides an application in part on the truth of a certain event or circumstance, it is required by DoD regulations to "make a finding of fact for each such event or circumstance." *Id.* at § E3.5.3.2.2.

29.     While the AFDRB may rely on the presumption of regularity in making this finding of fact, "the decisional document shall set forth the basis for relying on the presumption of regularity and explain the reasons the contradictory evidence was insufficient to overcome the presumption." *Id.* at § E3.5.3.2.2.2.

30.     The Boards for Correction of Military/Naval Records may also correct military records. 10 U.S.C. § 1552. The statute does not require a veteran to apply to both boards prior to seeking judicial review, nor does it establish any sort of internal appeals process. *Id.*

31.     Federal courts may review AFDRB decisions under the APA. 5 U.S.C. §§ 702-06.

32.     The Air Force and other administrative agencies are responsible for maintaining records for a variety of official purposes, including judicial review of agency action. 5 U.S.C. § 552a(e)(5); 44 U.S.C. §§ 3101, 3301; 32 C.F.R § 865.116.

33.     The AFDRB must also make all decisional documents available for inspection and review by the public. 32 C.F.R. § 865.116. Only names, addresses, social security numbers, and military service numbers may be redacted without written justification. 32 C.F.R. § 865.118(b).

34.     These decisional documents must be indexed and in a usable and concise form "so as to enable the public and those who represent applicants before the DRB to isolate from all these decisions that are indexed those cases that may be similar to an applicant's case and that indicate

the circumstances under and/or reasons for which the DRB or the Secretary of the Air Force granted or denied relief." 32 C.F.R. § 865.118(e).

35.     Two lawsuits— *Kennedy v. Esper*, No. 16-CV-2010, 2018 WL 6727353 (D.Conn.), and *Manker v. Spencer*, 329 F.R.D. 110 (D. Conn. 2018)—have challenged, respectively, the adherence of the Army Discharge Review Board (ADRB) and the Naval Discharge Review Board (NDRB) to these regulatory and statutory requirements. Earlier this year, Judge Charles S. Haight of the U.S. District Court for Connecticut approved a settlement in the Army case, pursuant to which the Army agreed to adopt revised decisional procedures to ensure the ADRB meaningfully applies liberal consideration. *Kennedy v. Esper*, No. 16-CV-2010, 2018 WL 6727353 (D.Conn.), ECF No. 223. Judge Haight also recently noted that the parties in *Manker* have reached an agreement, subject to the Court's review. *Manker v. Spencer*, 329 F.R.D. 110 (D. Conn. 2018), ECF No. 191.

## FACTS AND PROCEEDINGS

### Allegations as to Class Representative Jane Doe

36.     Jane Doe was born in New London, Connecticut. She is a bisexual Black woman. She was raised by her mother and currently resides in Connecticut.

37.     In 2013, Ms. Doe enlisted in the Air Force, despite her aspirations to go to college, due to the overriding duty she felt to provide for her family.

38.     At the end of basic training, Ms. Doe began dating a fellow airman. At least two airwomen noticed that Ms. Doe's boyfriend was verbally abusive to her.

39.     After basic training, Ms. Doe advanced to technical school. Ms. Doe continued dating her boyfriend, though he was stationed in another state after basic training.

40.     Shortly before graduating from technical school, in 2014, Ms. Doe was raped by another airman during a social gathering. Ms. Doe confided in her boyfriend, who accused her of being unfaithful.

41.     Upon completing technical school, Ms. Doe confided in a friend about the rape. Without Ms. Doe's knowledge, this friend informed their supervising officers, and the Air Force started an investigation, but it did not result in any charges or discipline of the airman.

42.     The next month, Ms. Doe failed a physical fitness test and, as a result, received her first letter of counseling.

43.     Ms. Doe did not feel comfortable with the investigation or with her leadership knowing about the trauma she had experienced. As a result, Ms. Doe requested and received a transfer to another base.

44.     In late 2014, Ms. Doe was transferred to the base where her boyfriend was stationed. Her boyfriend continued subjecting Ms. Doe to physical and emotional abuse, which continued throughout the remainder of Ms. Doe's time in the Air Force.

45.     On one occasion, Ms. Doe's boyfriend punched a refrigerator door with such force that he broke his hand. He then pointed at the resulting dent in the refrigerator and told Ms. Doe that the dent should have been her.

46.     In early 2015, when Ms. Doe attempted to confront her boyfriend about his infidelity, he violently choked her, threw her to the ground, and ripped her clothes off.

47.     In another incident, Ms. Doe's boyfriend again tore Ms. Doe's clothes off, pinned her down by sitting on top of her, and hit her repeatedly. While on top of Ms. Doe, he told her to stop screaming because no one would help her.

48.     In another incident, Ms. Doe's boyfriend punched Ms. Doe and threw her into a wall with enough force to leave a large hole. His roommate overheard the tumult and reported the incident. During Ms. Doe's discussions with military authorities, she denied that any abuse occurred in order to protect her boyfriend and their relationship.

49.     Based on these statements, investigators wrongly determined Ms. Doe was the aggressor in the relationship and issued a 30-day no contact order (NCO). Her commander later ordered a three-year military protective order, which stipulated that Ms. Doe and her boyfriend must refrain from contact.

50.     Because of the stress and trauma caused by the MST and IPV that Ms. Doe experienced, as well as her serious mental health symptoms, later diagnosed as PTSD, Ms. Doe's job performance suffered. As a result, she received two letters of reprimand for minor infractions: the first for arriving late to duty and the second for failing to adhere perfectly to documentation requirements regarding maintenance she performed.

51.     During this time, Ms. Doe and her boyfriend continued seeing each other romantically, in violation of the protective order. Ms. Doe admitted to this contact when her leadership confronted her about it and received a nonjudicial punishment as a result.

52.     A few months later, Ms. Doe received her third letter of reprimand for failing another physical fitness test.  Ms. Doe's Commander then ordered her to undergo a Command Directed Mental Health Evaluation (CDE).

53.     The CDE recommended that Ms. Doe be discharged. As a result, Ms. Doe's Commander began the administrative separation process.

54.     Ms. Doe was discharged with a General (Under Honorable Conditions) discharge status on July 14, 2016. The narrative reason for her separation was minor misconduct.

55.     After her discharge, Ms. Doe continued to struggle with the lingering trauma from her experiences of MST and the concomitant symptoms of her PTSD.

56.     Facing financial insolvency, Ms. Doe returned to Connecticut to live with her family.

57.     In 2020, Ms. Doe received a diagnosis of PTSD from her VA treatment provider. She also received a PTSD diagnosis from forensic psychiatrists at the Yale School of Medicine.

58.     Ms. Doe's General (Under Honorable Conditions) status does not accurately reflect the nature of her service, nor does the reason for separation, given as "Minor Misconduct."

59.     The "minor misconduct" that resulted in her discharge was a direct result of the MST she experienced and her resulting PTSD.

60.     Despite the stigma Ms. Doe faces from her discharge status and her struggle with PTSD, she has worked hard to get her life back on track. Ms. Doe has worked part-time since February 2019. She has also been taking college classes part-time since September 2019 and is working toward a degree in Robotics and Mechatronics Engineering.

61.     Because of her General (Under Honorable Conditions) discharge, Ms. Doe is ineligible for education benefits under the GI Bill.

62.     In August 2020, Ms. Doe applied to the AFDRB, requesting that her discharge status be upgraded to Honorable. She presented substantial documentary and testimonial evidence demonstrating that her minor misconduct was attributable to, and mitigated by, her then-undiagnosed PTSD.

63.     At the virtual hearing, Ms. Doe was represented by *pro bono* counsel. Ms. Doe provided testimony, as did a psychiatrist who testified about Ms. Doe's PTSD.

64.     Despite the psychiatrist's presence at the hearing, the Board did not direct any questions to the doctor. The Board instead asked Ms. Doe to explain how her behavior at the time of her discharge constituted symptoms of PTSD and why a personality disorder diagnosis was not more appropriate.

65.     On December 28, 2020, the AFDRB denied Ms. Doe's discharge upgrade application in terse, boilerplate language.

66.     The AFDRB failed to apply "liberal consideration" given Ms. Doe's two documented diagnoses of PTSD—one by a VA practitioner and one by private doctors.

67.     Further ignoring the Hagel, Kurta, and Wilkie Memos' requirements, the Board did not afford Ms. Doe's application liberal consideration despite evidence of her experiences of MST and IPV.

68.     The Board also ignored the Hagel, Kurta, and Wilkie Memos' requirements in finding that Ms. Doe's experiences of IPV, and resulting PTSD, did not mitigate her misconduct. The Board merely recited that "the administrative actions taken by [Ms. Doe's] chain of command" gave her "ample opportunities to change her negative behavior."

69.     The AFDRB did not explain what administrative actions taken by Ms. Doe's chain of command provided her with such opportunities, nor how these administrative actions could have resolved the impact of Ms. Doe's experiences of IPV, and resulting PTSD, on her conduct.

70.     The AFDRB also did not explain why it apparently disregarded the evidence from a psychiatrist that Ms. Doe's experiences of MST, IPV, and resulting PTSD symptoms played an instrumental role in the minor infractions she committed. Instead, the Board merely stated summarily that it "found no conclusive indication that any mental health issues had a direct impact

on the applicant's misconduct or discharge." Ex. 4, AFDRB Decision, No. FD-2020-00606, Dec. 20, 2020 ("Doe AFDRB Decision").

**Allegations as to Class Representative Martin Johnson**

71.     Martin Johnson was born in Everett, Massachusetts. Mr. Johnson, a Black man, currently resides in Massachusetts with his mother.

72.     In November 2005, Mr. Johnson enlisted in the Air Force immediately after completing high school. He was committed to completing his six-year term of service. He began his service in April 2006.

73.     Mr. Johnson struggled early in his service to become accustomed to Air Force norms. From March to September 2007, Mr. Johnson received reprimands for minor infractions. He also received negative reviews from his superiors, who described him as an unprofessional airman who rarely showed initiative.

74.     Mr. Johnson received disciplinary action for each reprimand he received, all of which he understood, respected, and complied with. He also remained receptive to the feedback he received from his superiors, accepting responsibility for the actions that led to his unsatisfactory performance reviews.

75.     Mr. Johnson knew he needed to make a change. He focused on his responsibilities, took ownership of his career, and put in the time necessary to become a productive member of his unit.

76.     For the next two years, Mr. Johnson's career was a model of improvement. He earned awards and praise from the same superiors who had originally disciplined him. In one

review, he was described as a standout technician, and in another, he was called a "born leader." His superiors recommended he receive a promotion.

77.     In 2007, Mr. Johnson was deployed to Iraq as an F16 Crew Chief for seven months.

78.     During Mr. Johnson's first week in Iraq, a bomb exploded near him. To this day, he struggles being near fireworks and other loud explosions because they force him to relive his time in Iraq.

79.     After returning from his tour, Mr. Johnson discovered that his wife of two years was having an extramarital affair.

80.     This news was devastating to Mr. Johnson's fragile post-deployment mental state. He began to struggle mentally, which impacted both his personal and professional life.

81.     In August 2009, not long after learning of his wife's extramarital affair, Mr. Johnson was cited for failing to pay his military credit card bill and keep his lawn mowed in accordance with base housing guidelines.

82.     Mr. Johnson continued to care for his wife's daughter, but in doing so failed to keep the cleanliness of his house in order. As a result, he received an Article 15, a non-judicial reprimand for minor infractions, which caused him to spiral even further into depression.

83.     Despite his struggles, Mr. Johnson was still contributing positively to the Air Force. In August 2009, the same month he received his Article 15, Mr. Johnson received two reviews from his superiors. Both commented on his excellent performance and suggested Mr. Johnson be promoted immediately.

84.     Mr. Johnson wanted to continue getting his career back on track despite his mental health issues. He took additional shifts, volunteered during his time off, and offered to work all hours of the day to earn back the rank he lost as a result of his Article 15.

85. Mr. Johnson also made it clear that he did not take his Article 15 lightly. In a letter to his Lieutenant Colonel, Mr. Johnson described the impact the Article 15 had had on his personal and professional life.

86. Throughout these struggles, Mr. Johnson also sought medical treatment for his depression, the symptoms of which were exacerbated after receiving the Article 15.

87. None of this was enough. In December 2009, the Air Force began separation proceedings stating there was a "pattern of misconduct consisting solely of minor disciplinary infractions." Mr. Johnson was separated with a General (Under Honorable Conditions) discharge.

88. After separation, Mr. Johnson struggled to return to civilian life. He lives with his mother in Massachusetts, and recently lost his uncle due to complications from COVID-19.

89. Mr. Johnson has been diagnosed by a VA psychologist with recurrent major depressive disorder, social anxiety disorder, and PTSD, as well as other trauma. All of these disorders are a result of events that occurred during his service.

90. Mr. Johnson has continued trying to improve himself. He obtained a culinary certificate from Le Cordon Bleu and has completed, and continues to complete, programs offered by the VA that help treat PTSD. Most recently, Mr. Johnson has begun Dialectical Behavior Therapy (DBT) focused on interpersonal effectiveness treatment so that he can better acclimate within society.

91. Since Mr. Johnson's discharge, he has been seeking therapy for Attention Deficit Hyperactivity Disorder (ADHD), chronic stress disorder, and major depression. Since beginning treatment with the VA, Mr. Johnson has been prescribed several anti-depression medications.

92. Mr. Johnson's General (Under Honorable Conditions) status does not accurately reflect the nature of his service, nor does the reason for separation, given as "Minor Misconduct."

93.     The "minor misconduct" that led to Mr. Johnson's discharge was either a result of trauma from his service or from an early point in his service that did not reflect his actual character.

94.     During his service, Mr. Johnson was awarded the Meritorious Unit Commendation, Meritorious Unit Award, and National Defense Service Medal, among many other awards. He was a dedicated and hardworking airman, regularly commended and recognized by his superiors. He was recommended for promotions and lauded for leadership and dedication to the community at large.

95.     Mr. Johnson applied to the AFDRB requesting that his discharge status be upgraded to Honorable. He was represented by *pro bono* counsel and presented substantial documentary and testimonial evidence demonstrating that his minor misconduct was attributable to and mitigated by his in-service trauma.

96.     On May 18, 2021, the AFDRB unanimously denied Mr. Johnson's discharge upgrade application in boilerplate language.

97.     Ignoring the Hagel, Kurta, and Wilkie Memos' requirements, the Board did not afford Mr. Johnson's application liberal consideration despite evidence of his experiences of PTSD and other mental health conditions.

98.     The Board also ignored the Hagel and Kurta Memos' requirements in finding that Mr. Johnson's experiences of PTSD did not mitigate his misconduct. The Board merely noted that "most of the misconduct was prior to his deployment" without recognizing that Mr. Johnson was discharged for his post-deployment behavior.

99.     The AFDRB's conclusion boiled down to this: "The applicant's mental health condition may mitigate some of his behavior, but there is no evidence or records to indicate that the applicant's condition was so severe as to mitigate his entire service career of misconduct,

particularly when he was not seeking help for any mental health conditions at the time the majority of the incidents happened."  Ex. 5, AFDRB Decision, No. FD-2021-00040, May 19, 2021 ("Johnson AFDRB Decision"). Liberal consideration demands a further examination than this barebones explanation.

## Allegations as to the Class Generally

100.   Between 2001 and 2015, nearly 2.8 million U.S. military personnel—including approximately 518,000 members of the Air Force—deployed to U.S. military bases across the globe, with the vast majority serving in Iraq and Afghanistan.

101.   During approximately the same period—from 2002 to 2013—over 15 percent of all service members left the military with less-than-Honorable discharges. By contrast, approximately seven percent of Vietnam-Era veterans, and less than two percent of World War II-Era veterans received less-than-Honorable discharges.

102.   These hundreds of thousands of veterans with less-than-Honorable discharges are generally ineligible for numerous benefits that they otherwise earned through their service. This includes compensation for service-connected disabilities, special unemployment compensation programs for veterans, a military burial, and benefits for surviving family members.

103.   All veterans with a less-than-Honorable discharges are categorically denied GI Bill education benefits and civil service retirement credits, and while veterans with General discharges are eligible for limited other benefits, those with Other-Than-Honorable, Bad Conduct, and Dishonorable discharges are generally denied veterans' benefits provided by state and local governments.

104.    Without these benefits, veterans are unable to access the health care they need, forced to pay out of pocket for educational and vocational training opportunities, and left largely without the support that is vital to a successful transition back to civilian life.

105.    Furthermore, many employers reject applications from veterans with less-than-Honorable discharges, even when those discharges are associated with only minor misconduct. A less-than-Honorable discharge carries a stigma that casts doubt on a veteran's personal character and ability to perform as an employee.

106.    Employers regularly learn of an applicant's discharge status through a routine background check or by requesting that the veteran submit their discharge certificate (called a "DD-214") with their application.

107.    A derogatory narrative reason for separation, which also appears on a veteran's DD-214, can impose a similar or additional stigma on discharged veterans. For example, many less-than-Honorably discharged veterans receive a narrative reason for separation of "personality disorder" or "misconduct" without any additional explanation.

108.    Many veterans with less-than-Honorable discharges were discharged due to misconduct attributable to PTSD, TBI, or other mental health conditions that they developed because of their military service, including due to sexual or intimate partner violence.

109.    PTSD is a psychiatric disorder that can result from experiencing, witnessing, or confronting a traumatic event. Events that lead to PTSD are frequently life-threatening. PTSD is the most prevalent mental disorder arising from combat experience, and it is also frequently developed after sexual trauma. Its symptoms include flashbacks or nightmares relating to the traumatic event, avoidance of anything associated with the trauma, and hypervigilance, which often manifests in difficulty concentrating and irritability.

110.    PTSD may also give rise to PTSD-related mental health conditions, such as depression and anxiety, issues with drug or alcohol use, eating disorders, and suicidal thoughts.

111.    According to the VA, anywhere from 11 to 20 percent of Iraq and Afghanistan veterans suffer from PTSD in any given year.

112.    TBI is a disruption of normal brain functioning caused by a penetration brain injury or a violent bump or jolt to the head. TBI can result in a wide range of physical and psychological effects, and those effects may occur at unpredictable times after the initial injury. Symptoms of TBI include problems with speech, memory or concentration problems, mood swings, and unpredictable sleep patterns.

113.    Researchers estimate the rate of TBI amongst deployed Iraq and Afghanistan veterans to be between 11 and 23 percent.

114.    MST is sexual assault or harassment experienced during service. MST frequently impacts a person's physical and mental health, causing survivors to frequently feel unsafe, isolated from others, and unable to control their emotions. MST may also give rise to mental health conditions such as PTSD, depression and anxiety, issues with drug or alcohol use, eating disorders, and suicidal thoughts.

115.    Mental health issues and diagnoses as well as experiences of MST carry pervasive societal stigma that often deters individuals from seeking the help they need. This stigma is no less acute within the military.

116.    IPV is abuse or aggression that occurs in a romantic relationship. "Intimate partner" refers to both current and former spouses and dating partners. This abuse includes physical violence, sexual violence, stalking, or psychological harm by a current or former partner or spouse.

IPV, too, can give rise to mental health conditions such as PTSD, depression and anxiety, issues with drug or alcohol use, eating disorders, and suicidal thoughts.

117.    Rates of MST across the military are particularly high among women. Among veterans who use VA healthcare, approximately 23 percent of women reported sexual assault during their time in the military, and approximately 55 percent of women reported sexual harassment in the military.

118.    Additionally, approximately 38 percent of men in the military reported sexual harassment. Survivors of MST are four times more likely to suffer from PTSD compared to veterans without experiences of sexual assault.

119.    The Air Force has struggled with the prevalence of MST. In 2019, the Air Force received the highest number of MST reports since it began tracking the figure.

120.    Veterans with less-than-Honorable discharges because of misconduct related to their mental health conditions or experiences of MST are saddled with both the symptoms or aftereffects of their mental health conditions or MST experiences *and* the stigma of their discharge. As a result, many of these veterans are unable to obtain the disability, educational, and other kinds of benefits they otherwise earned through service.

121.    The Government Accountability Office (GAO) estimates that in 2011-2015, more than 57,000 servicemembers were separated from the military for misconduct despite a diagnosis of PTSD, TBI, or another mental health condition that could be associated with misconduct. This amounts to 62 percent of all servicemembers separated for misconduct during that period.

122.    During this same period, the GAO found that the Air Force had major deficiencies in its processes for identifying PTSD and TBI among separating servicemembers. The report indicated that the Air Force only screened servicemembers for TBI or PTSD who were

involuntarily separated for misconduct, excluding servicemembers who were voluntarily separated for misconduct, and the Air Force required screening only for servicemembers who received a PTSD or TBI diagnosis from a doctor rather than from other healthcare providers. Additionally, the report found that the Air Force did not provide training on how to detect concussions or mild TBI in a deployed setting.

123.   Overall, the GAO found more deficiencies in the Air Force's PTSD and TBI screening and training processes than in those of any other service branch. These deficiencies resulted in the discharge of service members without consideration of how mental health conditions may have contributed to their misconduct.

124.   The Air Force has neglected to implement more robust screening and training processes because its leadership harbors deep doubts about the existence and impact of PTSD, TBI, and other mental health conditions.

125.   Along with explaining the pervasive procedural deficiencies in its screening and training programs, the Air Force's suspicion of mental health, MST-related, and IPV claims animates the decisions of the AFDRB.

126.   In establishing the DRBs, Congress expressed an intent to avoid over-harsh consequences for servicemembers discharged as the result of separation decisions made in the field, often in haste or with imperfect information. Congress has amended the DRB statute to reflect special concern for those with mental health conditions, TBI, and survivors of MST and IPV, especially as MST has emerged as a prevalent problem within the military in recent years.

127.   But contrary to the equitable purpose for which the AFDRB was established, according to records released by the AFDRB, between January 2017 and December 2019, the AFDRB issued denials to 72 percent of Air Force veterans seeking discharge upgrades in

connection with PTSD, TBI, and other mental health conditions, and 60 percent of those seeking upgrades in connection with experiences of MST.

128.    The AFDRB denies such a high percentage of these applications because it harbors a deep suspicion that these mental health, TBI, MST, and IPV claims are invalid. These views are discriminatory and contradict the intentions expressed by Congress in the Hagel and Kurta Memos.

129.    In a sample of 180 AFDRB decisions issued after the Kurta Memo was published, randomly selected from all decisions issued by the AFDRB during that period, 164 purported to apply liberal consideration. However, only 39 of these liberal consideration applications, or 24 percent, were granted.

130.    The AFDRB frequently denies veterans' discharge upgrade applications without explaining why their evidence of mitigating factors is insufficient to outweigh their misconduct.

131.    Since issuance of the Hagel Memo in 2014 and the Kurta Memo in 2017, the AFDRB has recognized that these binding instructions apply to its adjudications.

132.    Even though the AFDRB frequently cites the Kurta Memo, the Board still routinely ignores the standards set out by that guidance. In the sample of decisions discussed above, the Board never indicated what liberal consideration required or how they had adequately applied "liberal" or "special" consideration to applicants' circumstances, even when purporting to follow these binding instructions.

133.    Rather, this sample revealed that the AFDRB relies on a set of boilerplate phrases— such as "through the administrative actions taken by the chain of command in this case, the applicant had ample opportunities to change his negative behavior" and "after a thorough review of the service record and inputs from the board's psychiatrist/psychologist, the DRB found no

conclusive indication that any mental health issues had a direct impact on the applicant's misconduct or discharge"—to deny relief.

134.   Such perfunctory dispositions and failures to engage with the evidence hardly constitute meaningful consideration, let alone liberal consideration. Indeed, they are deployed by the AFDRB as pretext for their real reason for denying these claims: their suspicion of the mental health, TBI, MST, and IPV claims that underlie these veterans' applications.

135.   From procedural deficiencies to substantive ones, the Air Force has demonstrated its culture of skepticism with respect to mental health symptoms and conditions.

136.   Evidence showing that invidious racial discrimination informs the Air Force's initial discharge decisions suggests that the Air Force is even more skeptical of mental health and MST claims made by airmen and women of color, than by white service members. Young Black service members are almost twice as likely to be involuntarily discharged from the Air Force with misconduct as the basis for separation.

137.   The AFDRB allows this skepticism to guide its decision-making despite its knowledge, including from prior class actions brought against other service branches, that relying on these rationales contravenes congressional intent and binding guidance.

138.   Moreover, the AFDRB frequently denies discharge upgrade applications on the basis of the presumption of governmental regularity, without explaining why this presumption applies and why evidence provided is insufficient to rebut it, particularly in view of the federal statute that codifies the "liberal consideration" standard of the Hagel and Kurta Memos.

139.   The Air Force also routinely loses documents of which it is legally required to maintain possession. In such cases, the AFDRB routinely draws an inference in favor of the government, in derogation of spoliation of evidence principles.

140.    Moreover, in order to assist veterans in preparing their own discharge upgrade applications, the AFDRB is required to promptly publish all discharge upgrade decisions to a publicly available online reading room.

141.    Despite its legal obligation to promptly make public all decisional documents relating to discharge upgrade applications, the AFDRB routinely delays such publication or altogether fails to publish past decisions.

142.    Without the benefit of clear and available prior decisions, the AFDRB deprives applicants of the opportunity to cite cases that may be similar to their own case. Furthermore, even veterans with meritorious cases are often unaware of how to satisfy the AFDRB's unclear decisional standards due to the dearth of clear and available precedent.

143.    The AFDRB continues in these practices despite being put on notice of their deficiencies through prior class actions brought against the ADRB and the NDRB.

### The Proposed Class Definition

144.    This is a class action seeking equitable relief under Rule 23(b)(2) of the Federal Rules of Civil Procedure for violations of the APA, the Fifth Amendment, and Section 504 of the Rehabilitation Act.

145.    The proposed class includes all Air Force veterans who: (a) were discharged with less-than-Honorable discharges from the Air Force (this includes General and Other-than-Honorable discharges from the Air Force, Air Force Reserve, and Air National Guard; and Bad Conduct discharges from special court-martials, but excludes uncharacterized discharges); (b) were discharged within the last fifteen years or, if discharged more than fifteen years ago, received a discharge upgrade decision from the AFDRB within the last six years; (c) have not received discharge upgrades to Honorable; and (d) have mental health conditions such as PTSD and PTSD-related conditions, TBI, or experiences of MST or IPV, that have resulted in a physical or mental

impairment that substantially limits one or more major life activities, or have records documenting one or more of the aforementioned experiences or conditions.

**The Proposed Class Satisfies the Requirements of Rule 23**

146.   The members of the proposed class are so numerous that joinder of all members is impracticable. The limited statistics that the AFDRB has released from 2017–2019 show that there are at least 341 class members from those two years alone who showed mental health conditions or experiences of sexual assault or harassment and were denied a discharge upgrade.

147.   Over 32,454 Air Force veterans have received less-than-Honorable discharges since 2002. Thousands of these former service members suffered combat-related PTSD or PTSD-related conditions, TBI, MST, or IPV but received a less-than-Honorable discharge for misconduct attributable to these conditions.

148.   Since the Hagel Memo was issued in 2014, nearly two-thirds of veterans who applied for a discharge upgrade to the AFDRB and qualified for liberal consideration were denied.

149.   The members' injuries derive from a unitary course of conduct by the centralized, hierarchical systems supervised and controlled by the Air Force; many members of the proposed class suffer serious psychological, medical, and financial consequences as a result of the long-term stigma associated with their less-than-Honorable discharges and the benefits they are denied as a result of their discharge status.

150.   There are questions of law and fact common to the proposed class, including, but not limited to, whether:

> a.   Defendant has failed consistently to apply the liberal consideration standard in the discharge upgrade review process, resulting in arbitrary and capricious adjudications in violation of the APA;

b.   Defendant has failed to comply with the Hagel Memo, Kurta Memo, and subsequent implementing guidance and statutory codification;

c.   Defendant has deprived the plaintiffs and putative class members of protected liberty and property interests without due process of law, resulting in an unconstitutional administrative process in violation of the APA and the Due Process Clause; and

d.   Defendant has excluded class members from participation in, denied them the benefits of, or subjected them to discrimination in AFDRB adjudications, solely by reason of the class member's disability, in violation of Section 504 of the Rehabilitation Act.

151.   The claims of both Plaintiffs are typical of the claims of the proposed class members.

152.   Plaintiffs and their counsel will fairly and adequately protect the interests of the proposed class.

153.   Defendant, in failing to properly implement the AFDRB's statutory mandate and by using unclear and unlawful standards for discharge upgrades, has acted or refused to act on grounds that apply generally to the class, and therefore final injunctive relief and/or corresponding declaratory relief is appropriate respecting the class as a whole.

**Legal Claims of the Class**

**CLAIM I**

**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—Arbitrary and Capricious Agency Action**

154.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

155.    Defendant's denials of class members' discharge upgrade applications are final agency actions.

156.    The AFDRB grants only about 28 percent of applications involving allegations of a mental health condition, whereas the ADRB—which operates under the same statute, regulations, and guidance as the AFDRB, including the Hagel and Kurta Memos—grants approximately 45 percent of applications related to mental health conditions.

157.    Although the ADRB's grant rates in cases entitled to liberal consideration are significantly higher than those of the AFDRB, the ADRB's inadequate application of liberal consideration has also prompted a lawsuit, which was recently settled with the Army's agreement to reconsider many denied applications and to revise its training, adjudication, and notice procedures. The Air Force has implemented none of the reforms agreed to by the Army.

158.    The discrepancy between AFDRB and ADRB grant rates results in part from the AFDRB's systematic failure to afford liberal consideration to applications involving allegations of a mental health condition, as required by the Hagel, Kurta, and Wilkie Memos.

159.    Although the AFDRB frequently cites and purports to apply liberal consideration, it fails to actually apply this standard, refusing to meaningfully engage with submitted evidence and instead relying on boilerplate language to perfunctorily dispose of cases.

160.    Defendant's failure to meaningfully apply the Hagel and Kurta Memos' "liberal consideration" standard to class members' applications constitutes arbitrary agency action, in violation of the APA, 5 U.S.C. § 706(2)(A).

161.    Defendant has further abused his discretion by failing to explain the evidentiary standards under which discharge upgrade applications are adjudicated. This has made it impossible for veterans to know what evidence the AFDRB would credit, and therefore impossible for these

veterans to prepare their applications effectively. Defendant's failure, moreover, has made it impossible for veterans to detect the AFDRB's abuses of discretion when weighing evidence.

162.    Defendant's failure to publish evidentiary standards for discharge upgrade applications constitutes arbitrary agency action, in violation of the APA, 5 U.S.C. § 706(2)(A).

163.    Given the systematic problems with the Air Force's treatment and discharge of veterans with misconduct related to PTSD, other mental health conditions, TBI, MST, and IPV, the AFDRB's application of the presumption of regularity in government affairs is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A). This is particularly true when the AFDRB applies the presumption to cases of missing records and fails to explain why the presumption is not rebutted in the face of contrary evidence, as is required by the DoD's own regulation. DODI 1332.28 § E3.5.3.2.2.2.

## CLAIM II

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)—Agency Action Contrary to Constitutional Right

164.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

165.    The due process protections of the Fifth Amendment require that federal administrative agencies follow their own regulations and sub-regulatory guidance in conducting their adjudications, and that they conduct adjudications in a fair and orderly manner.

166.    Although the AFDRB cites and purports to apply liberal consideration, it fails to actually apply this standard, refusing to meaningfully engage with submitted evidence, and instead relying on boilerplate language to perfunctorily dispose of cases.

167.   By not meaningfully applying the Hagel and Kurta Memos and the liberal consideration standard they set forth to class members' applications, Defendant has failed to follow its own rules, in violation of its constitutional obligations and the APA, 5 U.S.C. § 706(2)(B).

168.   Given the systematic problems with the Air Force's treatment and discharge of veterans with misconduct related to PTSD, other mental health conditions, TBI, MST, and IPV, the AFDRB's application of the presumption of regularity in government affairs is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A). This is particularly true when the AFDRB applies the presumption to cases of missing records and fails to explain why the presumption is not rebutted in the face of contrary evidence, as is required by the Department of Defense's own regulation. DODI 1332.28 § E3.5.3.2.2.2.

169.   The failure of the AFDRB to explain how the presumption of regularity operates, when it is rebutted, and why it is justified results in veterans lacking adequate notice of the standards that will be used to adjudicate their applications. This violates constitutional rights to procedural due process, which is a violation of the APA's guarantee of constitutional agency actions.

170.   By not publishing evidentiary standards, Defendant has further acted unconstitutionally, in violation of the APA. Defendant's secrecy on this point has made it impossible for veterans to prepare effective applications or to understand how the AFDRB arrives at a given outcome, contrary to principles of fair adjudication.

171.   Defendant's failure to publish evidentiary standards has also rendered the decision-making process a black box where abuses of discretion in weighing evidence are undetectable.

172.   Finally, Defendant's high rate of denying mental health-related discharge upgrades—about 72 percent—indicates that the AFDRB has a systemic institutional bias or secret

policy that discriminates against applicants who suffer from mental health conditions or TBI, or have had an experience of MST or IPV.

173.    This secret policy is unfair and contrary to the plaintiffs' constitutional right to due process because it contradicts public guidance, such as the Hagel and Kurta Memos, and because it underlies a sham decision-making process whereby denial is virtually preordained for applicants before the AFDRB due to prejudice.

174.    Veterans improperly denied discharge upgrades are subjected to undue stigma as a result of both their discharge characterization and their narrative reasons for separation. They are also denied access to VA benefits and other services that they have rightfully earned through their service. Veterans are thus deprived of protected liberty and property interests.

175.    The due process protections of the Fifth Amendment also prohibit federal administrative agencies from denying the equal protection of the laws to those whose claims they adjudicate.

176.    People with disabilities, especially those with invisible disabilities, often experience invalidation and allegations of fraud. The conception of people with disabilities as people who are "benefit fraudsters" and leeches pervades the military, healthcare, and justice systems in a similar manner to race.

177.    The AFDRB's secret policy also violates the plaintiffs' constitutional right to equal protection of the laws because, with discriminatory motive and intent, it discredits the claims of applicants with mental health conditions because of their status as individuals with disabilities.

178.    The AFDRB's secret policy that discriminates against applicants who suffer from mental health conditions is contrary to plaintiffs' constitutional rights and in violation of the APA, 5 U.S.C. § 706(2)(B).

## CLAIM III

**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)—Agency Action in Excess of Statutory Authority or Short of Statutory Right**

179.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

180.    In establishing the AFDRB, Congress recognized that a less-than-Honorable discharge issued to maintain military discipline should not be a life sentence when a veteran has not acted out of moral turpitude, especially when the veteran's underlying misconduct may be attributable to the stressors of combat, mental health conditions, or experiences of MST or IPV. 10 U.S.C. § 1553.

181.    Congressional intent in establishing review boards such as the AFDRB was to protect veterans with less-than-fully-Honorable discharges from the unjust burden of such life sentences.

182.    In its widespread denial of PTSD-related discharge upgrade applications, Defendant has failed to carry out Congress's intent in establishing the DRB and setting forth the governing standards, thereby exceeding its authority, and has fallen short of vindicating the statutory rights Congress created for veterans, in violation of the APA, 5 U.S.C. § 706(2)(C).

## CLAIM IV

**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E)—Agency Action Unsupported by Substantial Evidence**

183.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

184.    The AFDRB relies on prefabricated phrases to dispose of applications without weighing the evidence submitted by each applicant.

185.     As a result of its refusal to consider the submitted evidence, the AFDRB regularly denies applications where substantial evidence exists that the applicant's PTSD, TBI, mental health condition, or experience of MST or IPV mitigates the misconduct that led to their discharge.

186.     The AFDRB's sham decision-making process, whereby denial is virtually preordained for applicants before the AFDRB due to prejudice, produces decisions unsupported by substantial evidence, in violation of the APA, 5 U.S.C. § 706(2)(E).

## CLAIM V

### Violations of Section 504 of the Rehabilitation Act of 1973

187.     The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

188.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

189.     An individual with PTSD, TBI, or other mental health conditions is an "individual with a disability" within the meaning of Section 504.

190.     Defendant's activity of reviewing military records to determine whether to upgrade the discharge statuses of former servicemembers has received substantial federal financial assistance at all relevant times and is an activity of a federal agency.

191.     Defendant discriminates against the proposed class members on the basis of their disabilities by refusing to apply binding standards that mandate consideration of PTSD, TBI, and other mental health conditions when reviewing their discharge upgrade applications, and in their widespread refusal to upgrade the discharges of veterans with disabilities.

192.    As a result, these veterans are denied the impartial adjudications provided to able-bodied veterans, including upgrades of their discharge statuses, and the benefits associated with such upgrades. The AFDRB's form language and blanket denials of upgrades to veterans with PTSD, TBI, and other mental health conditions unequivocally illustrate a lack of understanding of the experiences of people with disabilities and results in prejudice against them during the discharge upgrade process.

## CLAIM VI

### Violations of the Rehabilitation Act's Implementing Regulations

193.    The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration that: (i) Subject qualified handicapped persons to discrimination on the basis of handicap; [or] (ii) Defeat or substantially impair accomplishment of the objectives of the recipient's or DoD Component's program or activity with respect to handicapped persons." 32 C.F.R. § 56.8.

194.    Defendant's criteria and methods of administration of their discharge review program violate the implementing regulations by failing to utilize consistent standards for consideration of plaintiffs' discharge upgrade applications related to PTSD, TBI, or other mental health conditions.

195.    This failure (1) results in the widespread denial of applications from veterans with PTSD, TBI, or mental health conditions, (2) subjects proposed class members to discrimination, and (3) defeats the purposes of the Defendant's review processes, which include the review and correction of any military record when necessary to correct an error or remove an injustice, all in violation of Section 504.

196.    The Defendant's foregoing conduct violates Section 504.

## CLAIM VII

### Violations of the Fifth Amendment to the United States Constitution

197.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

198.   The due process and equal protection violations set forth above, which constitute agency action contrary to constitutional right inconsistent with the APA, also directly violate the Fifth Amendment itself.

## <u>LEGAL CLAIMS OF DOE</u>

### CLAIM VIII

### Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), (C), (E)

199.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

200.   Defendant's denial, through the AFDRB, of Ms. Doe's discharge upgrade application is a final agency action.

201.   Defendant's reliance on boilerplate phrases and failure to engage with the submitted evidence of Ms. Doe's PTSD diagnosis and experiences of MST and IPV constitute a failure to meaningfully apply the liberal consideration required by the Hagel, Kurta and Wilkie Memos, and their codification in statute.

202.   Defendant failed to consider important evidence that demonstrated that Ms. Doe's PTSD and experiences of MST and IPV mitigated the minor misconduct that led to her discharge.

203.   Defendant failed to follow its own rules by not explaining why the submitted evidence that Ms. Doe's misconduct was a product of her PTSD and experiences of MST and IPV

did not provide a "conclusive indication that any mental health issues had a direct impact on [her] misconduct or discharge."

204.   Defendant failed to follow its own rules by not explaining what administrative actions provided Ms. Doe "ample opportunities to change her negative behavior" nor how these administrative actions could have resolved the impact of her MST, IPV, and PTSD on her conduct.

205.   Defendant failed to follow its own rules by not responding to all the facts and issues raised in Ms. Doe's application.

206.   Defendant's failure to meaningfully apply the Hagel, Kurta, and Wilkie Memos to Ms. Doe's application, and its failure to consider and respond to all the facts and issues raised therein, were arbitrary and capricious, an abuse of Defendant's discretion, contrary to the Due Process Clause and equal protection component of the Fifth Amendment, in excess of Defendant's statutory authority, and unsupported by substantial evidence, in violation of the APA, 5 U.S.C. § 706(2).

## CLAIM IX

### Violation of Section 504 of the Rehabilitation Act of 1973

207.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

208.   Ms. Doe is an "individual with a disability" within the meaning of § 504.

209.   Defendant's activity of reviewing military records to determine whether to upgrade the discharge statuses of former servicemembers has received substantial federal financial assistance at all relevant times and is an activity of a federal agency.

210.   Defendant discriminated against Ms. Doe on the basis of her disability by refusing to apply binding standards that mandate liberal consideration of PTSD in the discharge upgrade

review process. As a result, Ms. Doe was denied benefits conferred to able-bodied veterans, including upgrade of her discharge status and the benefits associated with such upgrades. The form language the AFDRB used to deny Ms. Doe's discharge upgrade unequivocally illustrates a lack of understanding of the experiences of people with disabilities and results in prejudice against them during the discharge upgrade process.

211.   The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration that: (i) Subject qualified handicapped persons to discrimination on the basis of handicap; [or] (ii) Defeat or substantially impair accomplishment of the objectives of the recipient's or DoD Component's program or activity with respect to handicapped persons." 32 C.F.R. § 56.8.

212.   The criteria and method of administration used in adjudicating Ms. Doe's discharge upgrade application violated the implementing regulations by failing to utilize a consistent standard for consideration of her upgrade application based on PTSD.

213.   This failure subjected Ms. Doe to discrimination on the basis of her disability and defeated the purposes of the Defendant's review processes, which include the review and correction of any military record when necessary to correct an impropriety or inequity, all in violation of Section 504.

214.   The Defendant's foregoing conduct violates Section 504.

## CLAIM X

### Violations of the Fifth Amendment to the United States Constitution

215.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

216.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that administrative agencies provide notice and an opportunity to be heard before deprivation of a liberty or property interest.

217.    When false stigma and reputation damage are involved, the "opportunity to be heard" involves an opportunity to refute the charges.

218.    Defendant did not provide Ms. Doe with notice or a meaningful opportunity to be heard because the AFDRB either willfully failed to apply its own binding instructions or, in the alternative, followed undisclosed internal policy in choosing not to follow its own instructions in her case, depriving Ms. Doe of the chance to account for the role of her PTSD and experiences of MST and IPV in her misconduct. This has caused continuing stigma for Ms. Doe and bars her from the VA benefits she earned and to which she is otherwise entitled.

219.    The due process protections of the Fifth Amendment to the U.S. Constitution require that federal administrative agencies conduct adjudications in a fair and orderly manner.

220.    Defendant did not conduct a fair adjudication of Ms. Doe's discharge upgrade application because the AFDRB failed to meaningfully apply the Hagel, Kurta, and Wilkie Memos, and their statutory codification, to her claims.

221.    Defendant also failed to conduct a fair adjudication of Ms. Doe's discharge upgrade application because the AFDRB failed to provide her with an individualized articulation of the reasons for the denial of her application based on the evidence presented.

222.    The due process protections of the Fifth Amendment also require that federal administrative agencies follow their own regulations and guidance in their adjudications.

223.    Defendant failed to follow its own rules by failing to apply the Hagel, Kurta, and Wilkie Memos to Ms. Doe's application.

224.     Defendant also failed to follow its own rules by not explaining why the submitted evidence that Ms. Doe's misconduct was a product of her PTSD and experiences of MST and IPV did not provide a "conclusive indication that any mental health issues had a direct impact on [her] misconduct or discharge."

225.     Defendant further failed to follow its own rules by not explaining what administrative actions provided Ms. Doe "ample opportunities to change her negative behavior," nor how these actions could have resolved the impact of MST, IPV, and PTSD on her conduct.

226.     Defendant's decision deprived Ms. Doe of property in that it failed to correct her improper discharge, and thus she is denied access to VA education benefits that she rightfully earned through her service. Defendant's unlawful adjudication also subjects Ms. Doe to undue stigma, thereby depriving Ms. Doe of a liberty interest.

227.     The Defendant's foregoing conduct violates procedural due process requirements of the Fifth Amendment to the U.S. Constitution.

228.     The Due Process Clause of the Fifth Amendment of the United States Constitution also prohibits the federal government from denying individuals equal protection of the laws.

229.     The failure to upgrade Ms. Doe's discharge resulted from Air Force disciplinary and discharge upgrade practices that, with discriminatory motive and intent, punish Black service members at higher rates and more severely than similarly situated white service members.

230.     Studies commissioned by the Air Force demonstrate that Black airmen and women are far more likely to receive nonjudicial punishments than white service members. Moreover, Black and Hispanic servicemembers were more likely than white members to be the subject of an investigation and tried in courts martial.

231.    Ample evidence indicates that individuals are more likely to discredit the mental health claims of minorities, and specifically minority women, as compared to their white counterparts. These disparities pervade the military, healthcare, and justice systems.

232.    These studies reflect Ms. Doe's own experience in the military. Rather than treat Ms. Doe for the trauma induced by her PTSD, MST, and IPV, the military punished her, including blaming her for an incident in which she had been thrown into a wall by her abusive partner.

233.    The Air Force's culture of mistrust and discrimination against racial minorities and especially women of color affects the decisions of its adjudicative bodies, including the AFDRB.

234.    During her personal appearance hearing, AFDRB members interrogated Ms. Doe for several minutes about the veracity of her PTSD diagnosis. The Board chose to focus its questioning on whether Ms. Doe's symptoms actually rose to the level of PTSD despite substantial lay and medical evidence corroborating her condition, including expert witness testimony at the hearing from a psychiatrist who had diagnosed her with PTSD.

235.    By failing to correct Ms. Doe's improper discharge that resulted from the Air Force's racially discriminatory practices, Defendant violated the Fifth Amendment to the United States Constitution by depriving Ms. Doe equal protection of the laws.

236.    The AFDRB's skepticism of Ms. Doe's disability because of her race and gender constitute discrimination that violates the Fifth Amendment to the United States Constitution by depriving Ms. Doe equal protection of the laws.

237.    The AFDRB's denial of Ms. Doe's discharge upgrade application also resulted from the disproportionate punishment and skepticism, with discriminatory motive and intent, of people with disabilities in the Air Force and in the discharge upgrade process.

238.    Like those of other persons with disabilities, especially invisible disabilities, Ms. Doe's experiences as a disabled woman in the Air Force were doubted and ignored by her supervisors. This doubt continued in the discharge upgrade process, as the AFDRB failed to adequately take into account the severity of her disability and her disability's impact on her misconduct. The board members that heard Ms. Doe's application devoted nearly all of their questions to interrogating Ms. Doe on the veracity of her PTSD diagnosis, expressing skepticism that the symptoms she reported experiencing while in service constituted PTSD.

239.    There is no rational basis for disproportionately punishing and denying upgrades to people with disabilities. In fact, the Air Force has an obligation, as expressed through the Kurta and Hagel Memos, and their statutory codification, not to discriminate against people with disabilities.

240.    Defendant's discrimination against Ms. Doe on the basis of her race, gender, and disability violated the equal protection component of the Fifth Amendment Due Process Clause.

## LEGAL CLAIMS OF JOHNSON

### CLAIM XI

**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), (C), (E)**

241.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

242.    Defendant's denial, through the AFDRB, of Mr. Johnson's discharge upgrade application is a final agency action.

243.    Defendant's reliance on boilerplate phrases and failure to engage with the submitted evidence of Mr. Johnson's PTSD diagnosis constitute a failure to give the liberal consideration required by the Hagel, Kurta, and Wilkie Memos and their statutory codification.

244.   Defendant failed to consider important evidence that demonstrated that Mr. Johnson's PTSD mitigated the minor misconduct that led to his discharge.

245.   Defendant failed to follow its own rules by not explaining why the submitted evidence that Mr. Johnson's misconduct was a product of his PTSD "could not completely explain or excuse the misconduct sufficiently to warrant upgrading the discharge."

246.   Defendant failed to follow its own rules by not explaining why the "primary condition" that explained Mr. Johnson's misconduct was one that existed prior to service rather than his PTSD.

247.   Defendant failed to follow its own rules by not responding to all the facts and issues raised in Mr. Johnson's application.

248.   Defendant's failure to meaningfully apply the Hagel and Kurta Memos to Mr. Johnson's application, and its failure to consider and respond to all the facts and issues raised therein, were arbitrary and capricious, an abuse of Defendant's discretion, contrary to the Due Process Clause and equal protection component of the Fifth Amendment, in excess of Defendant's statutory authority, and unsupported by substantial evidence, in violation of the APA, 5 U.S.C. § 706(2).

## CLAIM XII

### Violation of Section 504 of the Rehabilitation Act of 1973

249.   The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

250.   Mr. Johnson is an "individual with a disability" within the meaning of § 504.

251.   Defendant discriminated against Mr. Johnson on the basis of his disability by refusing to apply binding standards that mandate liberal consideration of PTSD in the discharge upgrade review process. As a result, Mr. Johnson was denied benefits conferred to able-bodied

veterans, including upgrade of his discharge status and the benefits associated with such upgrades. The form language the AFDRB used to deny Mr. Johnson's discharge upgrade illustrates a lack of understanding of the experiences of people with disabilities and results in prejudice against them during the discharge upgrade process.

252. The criteria and method of administration used in adjudicating Mr. Johnson's upgrade application violated Section 504's implementing regulations, 32 C.F.R. § 56.8, by failing to utilize a consistent standard for consideration of his upgrade application based on PTSD.

253. This failure subjected Mr. Johnson to discrimination on the basis of his disability and defeated the purposes of the Defendant's review processes, which include the review and correction of any military record when necessary to correct an impropriety or inequity, all in violation of Section 504.

254. The Defendant's foregoing conduct violates Section 504.

## CLAIM XIII

### Violations of the Fifth Amendment to the United States Constitution

255. The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

256. Defendant did not provide Mr. Johnson with notice or a meaningful opportunity to be heard because the AFDRB either willfully failed to apply its own binding instructions (*e.g.*, the Hagel, Kurta, and Wilkie Memos) or, in the alternative, followed undisclosed internal policy in choosing not to follow its own instructions in his case, depriving Mr. Johnson of the chance to account for the role of his PTSD in his misconduct. This has caused continuing stigma for Mr. Johnson and barred him from the VA benefits he earned and to which he is otherwise entitled.

257.    Defendant did not conduct a fair adjudication of Mr. Johnson's discharge upgrade application because the AFDRB failed to meaningfully apply the Hagel and Kurta Memos and their statutory codification to his claims.

258.    Defendant also failed to conduct a fair adjudication of Mr. Johnson's discharge upgrade application because the AFDRB failed to provide him with a complete, individualized articulation of the reasons for the denial of his application based on the evidence presented.

259.    Defendant failed to follow its own rules by failing to apply the Hagel and Kurta Memos to Mr. Johnson's application.

260.    Defendant also failed to follow its own rules by not explaining why the submitted evidence that Mr. Johnson's misconduct was a product of his PTSD did not "explain or excuse the misconduct sufficiently to warrant upgrading the discharge."

261.    Defendant's decision deprived Mr. Johnson of property in that it failed to correct his improper discharge, and thus he is still being denied access to VA education benefits that he rightfully earned through his service. Defendant's unlawful adjudication also subjects Mr. Johnson to undue stigma as a result of both his discharge characterization and his narrative reasons for separation, thereby depriving Mr. Johnson of a liberty interest.

262.    The AFDRB's failure to upgrade Mr. Johnson's discharge also resulted from Air Force disciplinary and discharge upgrade practices that, with discriminatory motive and intent, punish Black service members at higher rates and more severely than similarly situated white service members.

263.    Rather than help Mr. Johnson obtain treatment for the trauma induced by his PTSD, the military punished him.

264.   The Air Force's culture of mistrust and discrimination against racial minorities and in particular men of color, affects the decisions of its adjudicative bodies, including the AFDRB.

265.   By failing to correct Mr. Johnson's improper discharge that resulted from the Air Force's racially discriminatory practices, Defendant violated the Fifth Amendment to the United States Constitution by depriving Mr. Johnson equal protection of the laws.

266.   The AFDRB's skepticism of Mr. Johnson's disability because of his race constitutes discrimination that violates the Fifth Amendment to the United States Constitution by depriving him of equal protection of the laws.

267.   The AFDRB's denial of Mr. Johnson's discharge upgrade application also resulted from the disproportionate punishment and skepticism, with discriminatory motive and intent, of people with disabilities in the Air Force and in the discharge upgrade process.

268.   Mr. Johnson's experiences as a disabled man were doubted and ignored by his supervisors. This doubt continued in the discharge upgrade process, as the AFDRB failed to adequately take into account the severity of his disability and his disability's impact on his misconduct.

269.   The Defendant's foregoing conduct violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Doe and Mr. Johnson respectfully request that the Court:

(1)   Certify the proposed class;

(2)   Grant all appropriate and equitable relief to redress past injury and to restrain future injury of the plaintiffs and members of the proposed class by Defendant;

(3)   Direct, by issuance of an injunction, measures sufficient to ensure that Defendant establishes constitutionally and statutorily compliant adjudication procedures, including, but not limited to, publication of secret policies, improved training of agency personnel, and clarified evidentiary standards;

(4)   Direct, by issuance of an injunction, measures sufficient to ensure that Defendant meaningfully and consistently applies its own procedural standards in considering the effects of class members' PTSD, other mental health conditions, TBIs, and experiences of MST and IPV when determining whether to upgrade their discharge statuses;

(5)   Direct, by issuance of an injunction, that the discharge status of Ms. Doe and Mr. Johnson be upgraded to Honorable;

(6)   Award attorneys' fees and costs to Ms. Doe and Mr. Johnson; and

(7)   Grant any other and further relief that the Court deems just and proper.


Dated: September 13, 2021
New Haven, Connecticut

Respectfully submitted,

By: /s/ Michael J. Wishnie

David Bassali, Law Student Intern*
Yael Caplan, Law Student Intern*
Alexis Kallen, Law Student Intern*
Shariful Khan, Law Student Intern*
Bardia Faghihvaseghi, Law Student Intern*
Meghan E. Brooks, Supervising Attorney, (ct31147)
Michael J. Wishnie, Supervising Attorney, (ct27221)
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800

Susan J. Kohlmann**
Jeremy M. Creelan**
Jacob Tracer**
Laurel A. Raymond**
Jenner & Block LLP
919 Third Avenue, New York, NY 10022-3908
Tel: (212) 891-1678
jcreelan@jenner.com

michael.wishnie@ylsclinics.org


\* Motion for Law Student Appearances forthcoming.
\*\* Motion for *Pro Hac Vice* Appearances forthcoming.