## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARTIN JOHNSON and JANE DOE, on behalf of themselves and all others similarly situated, | Civil Action No. 3:21 - CV - 1214 (CSH) |
| Plaintiffs, | |
| v. | |
| FRANK KENDALL, Secretary of the Air Force, | **JUNE 11, 2024** |
| Defendant. | |

## RULING AND ORDER APPROVING CLASS ACTION SETTLEMENT

**HAIGHT, Senior District Judge:**

In this nation-wide class action, Plaintiffs allege violations arising under the Administrative Procedure Act, 5 U.S.C. § 706; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations; and the Fifth Amendment Due Process Clause. Plaintiffs Johnson and Doe commenced this action on behalf of certain United States Air Force veterans against the Defendant Secretary of the Air Force, alleging that servicemembers suffering from traumatic brain injuries, post-traumatic stress disorder, and military sexual trauma improperly received less-than-Honorable discharges from the military and were denied the opportunity to have those discharges fairly reviewed on appeal. Said discharges resulted in adverse economic, medical, social, and

emotional consequences for those servicemembers.[1]  *See* Doc. 92, at 1.

In a prior "Order Granting Preliminary Approval of Class Action Settlement," the Court gave preliminary approval to the proposed settlement, directed the manner of notifying class members about the settlement, and scheduled a fairness hearing.  *See Johnson v. Kendall*, No. 3:21-CV-1214 (CSH), 2023 WL 6227678, at *11-14 (D. Conn. Sept. 26, 2023).  Notice to class members was given.  The Court held a fairness hearing.  The parties now move jointly for final Court approval of the proposed settlement.

Under the capable supervision of Magistrate Judge Robert M. Spector, the parties arrived at a settlement of this action, evidenced by a "Stipulation and Agreement of Settlement" [Doc. 92-1]. For the reasons that follow, the Court grants final approval of the comprehensive settlement proposed by the parties.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Familiarity is assumed with the  Court's "Order Granting Preliminary Approval of Class Action Settlement," 2023 WL 6227678,  which granted preliminary approval of the proposed settlement and issued directions for notification of class members. This Ruling reiterates certain aspects of the case's background and procedural history.

As set forth in the Complaint, upon discharge, military personnel receive a certification characterizing their service, such as "Honorable" or "Dishonorable," which affects their eligibility for veterans' benefits and support services administered by the United States Department of Veterans Affairs ("VA"). Doc. 1 ("Complaint"),  ¶¶ 16–18. In order to upgrade their discharge

---

[1]  The Court notes that this action follows two similar class actions brought against the Secretaries of the Army and Navy, which were each resolved by settlement. *See  Manker v. Del Toro*, No. 3:18-cv-372 (CSH); *Kennedy v. Whitley*, No. 3:16-cv-2010 (CSH).

characterization, veterans may apply to the Air Force Discharge Review Board ("AFDRB"), which acts on behalf of the Secretary of the Air Force. *Id*. ¶ 19. In 2014, then-Secretary of Defense Chuck Hagel instructed the AFDRB and other military review boards to give "special" or "liberal" consideration to applications from veterans diagnosed with post-traumatic stress disorder ("PTSD") and to consider PTSD and PTSD-related conditions as "potential mitigating factors in the misconduct that caused" a lesser characterization than "Honorable." *Id*. ¶¶ 20–21; *see also* Doc. 1-1 ("Hagel Memo"). Congress codified the "liberal consideration" policy in 2016, 10 U.S.C. § 1553(d)(3)(A)(ii) (2016), and further clarified that the Hagel Memo requirements also extended to applicants whose application for relief was based in whole or in part on matters relating to "traumatic brain injury"("TBI"), *id.* § 1553(d)(1)(A), as well as to those whose PTSD or TBI was "based in whole or in part on sexual trauma, intimate partner violence, or spousal abuse," *id.* § 1553(d)(1)(B). *See also* Doc. 1, ¶ 22.

Despite the policy change delineated in the Hagel Memo, between January 2017 and December 2019, the AFDRB denied 72 percent of the applications for review in which PTSD, TBI, or other mental health conditions were alleged to have been a factor. Doc. 1, ¶ 127. The AFDRB also issued denials to 60 percent of those seeking upgrades in connection with experiences of military sexual trauma ("MST"), defined as sexual assault or harassment experienced during service. *Id.*

Plaintiffs allege that the AFDRB inconsistently applies the policy as first set forth by the Hagel Memo, often without sufficient explanations to back up its decisions denying an upgrade. *Id.* ¶¶ 128–39. Moreover, the AFDRB fails to timely publish or publish at all these decisions despite legal obligations to make this information public. *Id.* ¶¶ 140–43. The lack of clear precedent, in

terms of both quality and quantity, causes confusion about the AFDRB's standards for upgrading characterizations. *Id.* ¶ 142. These practices have continued despite the filing and settlement of prior class actions against the Army and Navy which alleged substantially identical practices by those branches' review boards. *Id.* ¶ 143.

In the case at bar, named plaintiff Jane Doe enlisted in the Air Force in 2013. *Id.* ¶ 37. In 2014, she became the victim of rape by a fellow airman; and in 2015, she suffered physical, emotional, and sexual abuse by her boyfriend, another airman.   *Id.* ¶¶ 40–48.  Doe's job performance was negatively impacted as a result of her MST and her mental health symptoms, which were later diagnosed as PTSD. *Id.* ¶ 50.  She received reprimands for a series of relatively minor infractions, including arriving late to duty, failing to properly document maintenance, violating a protective order by continuing to see her boyfriend, and failing a physical fitness test. *Id.* ¶¶ 50-52.  Said infractions prompted her Commander to order her to undergo a mental health evaluation, which ultimately yielded a recommendation that she be discharged.  *Id.* ¶¶ 52–53.  As a result, in July 2016, Doe was discharged with a status of "General (Under Honorable Conditions)," which made her ineligible for education benefits under the GI Bill.  *Id.* ¶¶ 54, 61.

In August 2020, Doe applied to the AFDRB for an upgrade of her discharge status to Honorable.  *Id.* ¶ 62.  At that time, Doe presented the testimony of a psychiatrist regarding her PTSD diagnosis, as well her  own testimony and documentary evidence, to demonstrate that her minor misconduct had been attributable to, and mitigated by, her then-undiagnosed PTSD. *Id.* ¶¶ 62–64. On December 28, 2020, the AFDRB denied Doe's application in terse boilerplate language. *Id.* ¶¶ 65–70.

The other named plaintiff, Martin Johnson, enlisted in the Air Force in 2005 and was

deployed to Iraq as an F16 Crew Chief in 2007. *Id.* ¶¶ 72, 77. During his first week in Iraq, a bomb exploded near him, causing him to struggle "to this day" with "being near fireworks and other loud explosions." *Id.* ¶ 78. Upon returning from his seven-month tour, Johnson discovered that his wife was having an extramarital affair. *Id.* ¶ 79. This discovery devastated Johnson's "fragile post-deployment mental state," which then "impacted both his personal and professional life." *Id.* ¶ 80. Shortly thereafter, he received a citation for his failures to pay his military credit card bill and to keep his lawn mowed in accordance with base housing guidelines. *Id*. ¶ 81. He also received a subsequent Article 15 reprimand for failing to keep his house clean, causing him to spiral into depression.[2] *Id.* ¶ 82.

In response, Johnson tried to continue contributing positively to the Air Force and received two excellent performance reviews, including suggestions for immediate promotion, from his superiors. *Id.* ¶ 83. He also took additional shifts, volunteered during his time off, and offered to work all hours of the day to earn back the rank he lost from his reprimands. *Id.* ¶ 84. Nonetheless, in December 2009, Johnson was discharged with a "General (Under Honorable Conditions)" status due to a "pattern of misconduct consisting solely of minor disciplinary infractions." *Id.* ¶ 87.

Since his discharge, Johnson has been diagnosed by a psychologist at the VA with recurrent major depressive disorder, social anxiety disorder, PTSD, and other trauma. *Id.* ¶ 89. All of these

---

[2] The Court takes judicial notice that an Article 15 violation in the Air Force is "[n]onjudicial punishment under Article 15, Uniform Code of Military Justice (UCMJ) . . . in which a commander will decide whether or not an offender has committed a specific offense or offenses under the UCMJ." *See* https://www.barksdale.af.mil/Units/Fact-Sheets/Article/320200. Examples of such offenses include "[s]leeping on duty, disobeying military orders, disrespect to superiors, and underage drinking." *See* https://kralmilitarydefense.com/services/nonjudicial-punishment. Article 15 provides a commanding officer power to punish individuals for minor offenses not appropriate for court-martial but more serious than those meriting administrative counseling. *Id.*

disorders resulted from the events that occurred during his military service. *Id.*

Johnson applied to the AFDRB for an upgrade of his discharge status to Honorable, presenting substantial documentary and testimonial evidence to demonstrate that his minor misconduct was attributable to trauma during his service. *Id.* ¶ 95. However, on May 18, 2021, the AFDRB denied Johnson's application, again using unindividualized, boilerplate language. *Id.* ¶¶ 96–99.

As to the class of Plaintiffs, as certified under Rule 23(b)(2), Fed. R. Civ. P., that class includes "members and former members of the Air Force, Space Force, Air Force Reserve, and Air National Guard who served in the military during the Iraq and Afghanistan eras"—*i.e.*, with "discharge dates from October 7, 2001, through the Effective Date of Settlement." Doc. 94, at 15.[3] These Plaintiffs (1) were discharged with the following service characterizations: "Under Honorable Conditions (General), or Under Other Than Honorable Conditions (UOTHC);" (2) "who, if they submitted a previous discharge upgrade application or application for reconsideration, submitted at least one such application on or after September 13, 2006; [and] (3) have not received upgrades of their discharge characterizations to Honorable." *Id.* They all have been diagnosed with post-traumatic stress disorder, traumatic brain injury (TBI), or other mental health conditions, or have experienced sexual assault or sexual harassment, or have records documenting that one or more symptoms of PTSD, TBI, other mental health conditions, or experiences of sexual assault or sexual harassment existed during military service, under the Kurta Memo standard of liberal

---

[3] The Court cites the pages as indicated by the CM/ECF filing system, as opposed to the original page numbers of the documents (*e.g.,* page 12 of the Memorandum [Doc. 94] is stamped as page 15 on CM/ECF).

consideration.[4]  *Id.*

The two named veterans in the class had experiences that were representative of the AFDRB's general treatment of discharge upgrade applicants with PTSD, TBI, MST, or PTSD-related conditions. Named Plaintiff Doe  presented evidence to the AFDRB of her diagnosis with PTSD, but the AFDRB's rejection of her application purportedly failed to apply the "liberal consideration" standard.  Doc. 1, ¶¶ 62, 65- 67. Named Plaintiff Johnson also developed PTSD and other mental health conditions during his military service, but was similarly denied an upgrade from the AFDRB.  *Id.* ¶¶ 96–99.

Plaintiffs commenced this action against Defendant Frank Kendall, in his official capacity as United States Secretary of the Air Force, to challenge the AFDRB's characterization upgrade decision-making procedures.  *Id.* ¶ 15.  They allege that these procedures violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, and the Fifth Amendment Due Process Clause.  Doc. 1,  ¶¶ 10, 15.

## II.  STANDARDS OF REVIEW ON APPROVAL OF SETTLEMENT

In the Second Circuit, "[a] court may approve a class action settlement if it is fair, adequate, and reasonable, and not a product of collusion. . . . A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116  (2d Cir. 2005) (citations and internal quotation marks omitted). Moreover, the

---

[4]  The "Kurta  Memo" refers to the "Memorandum for Secretaries of the Military Departments" (Aug. 25, 2017) issued by  Anthony M. Kurta, Office of the Under Secretary of Defense. The "Wilkie Memo" refers to the "Memorandum for Secretaries of the Military Departments" (July 25, 2018) issued by Robert L. Wilkie, Office of the Under Secretary of Defense, which provides additional guidance to military discharge review boards.

Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context," where "[t]he compromise of complex litigation is encouraged by the courts and favored by public policy." *Id.* (citations and internal quotation marks omitted).

Class actions in federal district courts are governed by Federal Rule of Civil Procedure 23(e). Pursuant to that Rule, the "claims . . . of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Rule 23 was amended on December 1, 2018, "mainly to address issues related to settlement." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Prior to that amendment, Rule 23 required, in general terms, that a district court find a proposed settlement to be "fair, reasonable and adequate," but the Rule was silent on the factors the court should assess in making that evaluation. District courts, lacking guidance in the Rule, looked to circuit court cases.

In the Second Circuit, courts have traditionally examined the fairness of a proposed class action by applying the factors listed in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).[5] The designated "Grinnell factors" used to examine the fairness, reasonableness, and adequacy of a class settlement include:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

---

[5] *Abrogated on other grounds by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000).

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible

recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light

of all the attendant risks of litigation.

*Grinnell,* 495 F.2d at 463 (citations omitted). *See also Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*,

495 F.2d at 463).

With respect to such factors, the 2018 amendments to Rule 23(e) provided district courts

with specific instructions to consider "generated lists of factors" created by courts to "shed light"

on "[t]he central concern in reviewing a proposed class-action settlement"— namely, "that it be fair,

reasonable, and adequate." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment

("Subdivision (e)(2)"). The Advisory Committee further noted that "each circuit has developed its

own vocabulary for expressing these concerns," *id.*— such as *Grinnell* and its progeny in the Second

Circuit. "The goal of this amendment," explained the Advisory Committee, "is not to displace any

factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance

that should guide the decision whether to approve the proposal." *Id.*

As for *procedural* analysis factors, the 2018 amendments to Rule 23(e)(2) require the court

to consider whether "the class representatives and class counsel have adequately represented the

class," Fed. R. Civ. P. 23(e)(2)(A), and whether "the proposal was negotiated at arm's length," *id.*

23(e)(2)(B). The Advisory Committee's Notes clarify that "[t]hese paragraphs identify matters that

might be described as 'procedural' concerns, looking to the conduct of the litigation and of the

negotiations leading up to the proposed settlement." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("Paragraphs (A) and (B)").

As for *substantive* analysis factors, the amendments require the court to consider whether "the relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C), taking into account certain specified considerations which mostly overlap with those articulated in *Grinnell*, and whether "the proposal treats class members equitably relative to each other," *id.* 23(e)(2)(D). The Advisory Committee Notes state: "These paragraphs focus on what might be called a 'substantive' review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("Paragraphs (C) and (D)").

Given this history, and the guidance furnished by the Advisory Committee's Notes, in the case at bar I will consider both sets of factors—those articulated by the Second Circuit in *Grinnell* and those enumerated subsequently by the 2018 amendments to Rule 23(e). With this analysis, I will determine whether the proposed settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e) (2), and should accordingly be granted final approval by the Court.

### III.  THE PROPOSED SETTLEMENT

**A.  Settlement Resulted from a Procedurally Fair Process**

As previously noted by the Court in granting preliminary approval, the Settlement "is the result of extensive arms-length negotiations between able and experienced attorneys, conducted under the supervision, and with the energetic participation of, a gifted Magistrate Judge, and which appears to have been informed by counsel's experiences in *Kennedy* and *Manker*." *Johnson*, 2023 WL 6227678, at *9. No intervening event or reason has emerged to alter that conclusion. The

Settlement thus remains the result of a procedurally fair process.

In the Second Circuit, courts evaluate the procedural fairness of a class action settlement by considering the adequacy of class counsel, the adequacy of the class representatives, and whether the negotiations were conducted at arm's length. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 330 F.R.D. 11, 31-34 (E.D.N.Y. 2019); *Wal-Mart Stores*, 396 F.3d at 116; *Moses v. New York Times Co.*, 79 F.4th 235, 242–43 (2d Cir. 2023). Despite the Second Circuit's prohibition against "applying a presumption of fairness to a settlement agreement based on its negotiation at arm's length," "the arms-length quality of the negotiations remain[s] a factor in favor of approving the settlement (one whose absence would count significantly against approval)." *Moses*, 79 F.4th at 243.

In the case at bar, Class Counsel are experienced attorneys and law student interns from the Veterans Legal Services Clinic at Yale Law School and Jenner & Block LLP. These counsel represent that "[w]hen the Settlement was reached, Class Counsel had access to sufficient information through discovery outside the administrative record to evaluate the case and the AFDRB's practices for adjudicating discharge upgrade applications." Doc. 106-1 (Plaintiffs' Memo in Support of Application for Final Approval), at 16. They further assert that they were "able to draw on their prior experience litigating the *Kennedy* and *Manker* cases against comparable Discharge Review Boards operated by the Army and Navy." *Id.* Accordingly, "Class Counsel vigorously represented the interests of the class during a thorough negotiation process overseen by Judge Spector." *Id.* Due to their knowledge of the relevant factual and legal issues and their zealous advocacy during extensive court-supervised negotiations, Class Counsel's judgment that the Settlement is in the best interests of the class is entitled to "great weight." *In re NASDAQ*

*Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

Furthermore, the Class Representatives satisfy the adequate representation requirement of Rule 23(e)(2)(A) because they have "an interest in vigorously pursuing the claims of the class" and "have no interests antagonistic to the interests of other class members." *In re Payment Card Interchange Fee,* 330 F.R.D. at 31 (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 268 (2d Cir. 2006)). The interests of Plaintiffs Doe and Johnson align, rather than conflict, with those of the other class members. Even though not all class members will ultimately receive discharge upgrades pursuant to the procedures Plaintiffs seek to compel, each class member will be able to access a discharge upgrade process that will fairly adjudicate that member's claim. In particular, the requested relief "sweeps broadly enough to benefit each class member," so that no conflict is presented; in short, Plaintiffs Doe and Johnson are adequate representatives. *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 97 (2d Cir. 2015) (proposed relief held to benefit all class members where it "swe[pt] broadly enough to benefit each class member" because "[r]elief to each member of the class does not require that the relief to each member of the class be identical, only that it be beneficial") (citation and internal quotation marks omitted); *see also, e.g., Kennedy v. Whitley*, 539 F. Supp. 3d 261, 269 (D. Conn. 2021) (holding that a similar class was adequately represented by "veterans whose circumstances are typical of the claims asserted in the litigation" and "have been attentive to the case as it proceeded").

Additionally, the present Settlement is the result of an extensive arm's length negotiation, the result of three joint settlement conferences and multiple additional *ex parte* settlement conferences with Judge Spector. *See* Minute Entries re: pre-settlement and settlement conferences (Doc. 42 (4/18/2022), Doc. 51 (6/15/2022), Doc. 54 (7/11/2022), Doc. 58 (7/25/2022), Doc. 62

(8/1/2022), Doc.70 (9/6/2022)). There were also direct negotiations between the parties. Those conferences and negotiations followed meaningful discovery beyond the administrative record.

Under these circumstances—the adequacy of Class Counsel and the Class Representatives and the extensive negotiation history that culminated in the Agreement—I conclude that the Settlement is the result of a procedurally fair process.

## B.  Settlement Is Substantively Fair, Reasonable, and Adequate

As Class Counsel suggest, much like the settlements that this Court approved in *Manker* and *Kennedy*, the present  Settlement "confers a fundamental reform and substantial benefits in favor of veterans, while avoiding the risks, delays and expenses inherent in complex litigation." Doc. 106-1, at 17 (citing *Manker* Final Approval, No. 3:18-cv-372 (CSH) [Doc. 219], at 14). This Court thus preliminarily found that the Settlement at issue in the instant case is substantively fair, reasonable, and adequate, as required by Rule 23(e)(2)(C) and (D) and *Grinnell*.  *See Johnson,* 2023 WL 6227678, at *10.

Since that preliminary approval, the Settlement's terms have not changed and no class member has objected to them.[6]  It would thus appear that the Settlement remains substantively fair, reasonable, and adequate.

However, in order to grant final approval, in this Circuit, the Court must examine the Settlement's  adequacy, considering the costs, risks, and delay of trial and appeal, the effectiveness of distributing relief, the terms of attorney's fees, and whether class members are treated equitably.

---

[6]  In that Order granting preliminary approval of the Settlement, the Court provided "twenty-one calendar days before the fairness hearing" for  "any Class member who wishes to object to the fairness, reasonableness, or adequacy of this Settlement Agreement . . .[to] file with the Clerk of Court and serve on the parties a statement of [that] objection . . . ." *Johnson*, 2023 WL 6227678, at *11.

Fed. R. Civ. P. 23(e)(2)(C)- (D); *Moses,* 79 F.4th at 242, 243-44; *In re Payment Card Interchange Fee,* 330 F.R.D. at 29. Specifically, within the Second Circuit, courts make this determination with reference to the *Grinnell* factors, considering the factors "holistically." *Moses,* 79 F.4th at 243. "For a settlement to be substantively fair, 'not every factor must weigh in favor of settlement[;]' rather, 'the court should consider the totality of these factors in light of the particular circumstances.'" *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, No. 15-CV-1113 (VAB), 2016 WL 6542707, at *7 (D. Conn. Nov. 3, 2016) (quoting *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004)).

### 1. Significant Benefits for the Class

As constructed, the proposed Settlement provides significant elements of relief for class members. This relief is modeled after the relief afforded by the *Kennedy* and *Manker* settlements and would not otherwise be available to the class members in the present case.

First, the Settlement provides retrospective relief to thousands of class members who received an adverse AFDRB decision. Specifically, it requires automatic reconsideration of adverse decisions received from September 13, 2015 (six years before the date the Complaint was filed, a period that corresponds with the statute of limitations for Administrative Procedure Act claims), to the Effective Date of Settlement. Such adverse decisions include those in which the applicant did not receive a full upgrade to Honorable status where the underlying application contained a diagnosis or allegation of, or evidence documenting symptoms of, PTSD, TBI, or other mental health conditions, or experiences of sexual trauma or sexual harassment. *See* Doc. 92-1 ("Stipulation and Agreement of Settlement"), § IV.A.1.

Second, the Settlement provides "notice of reapplication rights," benefiting thousands of

members who received adverse decisions between September 13, 2006, and September 12, 2015, by providing them notice, referral information to legal and medical services, and the right to reapply to the AFDRB (or, where appropriate, notifying them of the right to apply to the Board for Correction of Military Records for discharges outside of the AFDRB's 15-year statute of limitations period). *Id.* § IV.B.1.

Third, all identified class members who were previously denied full relief by the AFDRB will be sent individual notice of their rights under the Settlement, including information about submitting additional medical and other evidence to further support their applications. *Id.* §§ IV.A.3, IV.B.2-3, IV.D. In addition, class members will receive information regarding referrals for free legal and medical services. *Id.* § IV.D. The AFDRB will also post these materials on its website. *Id*. § IV.C.

Fourth, the Settlement provides prospective relief to all future AFDRB applicants, including, but not limited to, class members. Under the Settlement, the AFDRB must append a medical opinion to its decisions, disclose the qualifications of the Board's mental health professional in certain circumstances, and provide a greater degree of articulated, narrative reasoning when it denies an application in "liberal consideration" cases. *Id.* § IV.F. These requirements materially benefit veterans and directly address the claims of the class by ensuring that the AFDRB will respond to the relevant factors in each adverse decision it issues and provide each applicant a detailed explanation for a denial.

Fifth, future AFDRB applicants will benefit from a one-year pilot program for those who claim to have PTSD, TBI, or other mental health conditions, or to have experienced sexual assault or sexual harassment. *Id.* § IV.E. If an AFDRB medical professional determines that the materials

submitted are insufficient to establish that a mental health condition or experience existed in service, the applicant will receive a notice inviting submission of additional evidence. *Id.* § IV.E.1. This term, which was not included in the *Kennedy* or *Manker* settlements, will enable veterans to address potential shortcomings in their discharge upgrade applications before the AFDRB issues a final decision.

Sixth, the Settlement requires the AFDRB to (a) provide a phone number for class members and future "applicants with questions to leave voicemail messages," and (b) return these calls via phone or "a written response" (if the applicant indicates such a preference for a written response by voicemail). *Id.* § IV.H.1. This program, set to operate on a trial basis for one year, will make the application process more accessible to applicants with disabilities and those without access to counsel, who may otherwise struggle to find clear answers to their application questions. *Id.*

Seventh, the Settlement allows class members and future applicants who request a personal appearance before the AFDRB to have greater opportunities to participate by requiring the AFDRB to continue to offer its universal Video-Teleconference ("VTC") Program. *Id.* § IV.I.

Eighth, the Settlement ensures that class members' applications will be reviewed by competent professionals who receive mandatory training. Specifically, the Settlement requires AFDRB members and staff to complete regular training specifically tailored to cases that reference or suggest PTSD, TBI, MST, or other mental health conditions. *Id.* § IV.G.1-4.

Ninth, the Settlement benefits all future applicants by requiring the AFDRB to give them improved notice of available legal and medical services and their right to provide additional medical evidence in support of their applications. *Id.* § IV.D.

Finally, the Settlement prevents arbitrary adjudication in the exercise of Secretarial Review

Authority by confirming that the Kurta and Wilkie Memos apply to any affirmance or reversal of an AFDRB decision. Moreover, the Secretary must "address each issue considered by the AFDRB" (including the AFDRB's consideration of each Kurta factor) in any action overturning a favorable decision in a liberal consideration case. *Id.* § IV.J.

Based on the foregoing, the multi-tiered structure of the Settlement "treat[s]class members equitably relative to each other," thereby satisfying Rule 23(e)(2)(D). *See Kennedy*, 539 F.Supp. 3d at 272 (similarly-structured settlement held to "confer[ ] substantial benefits upon all class members, in a manner which 'treats class members equitably relative to each other'") (quoting Fed. R. Civ. P 23(e)(2)(D)). As previously noted, rather than identical treatment, equitable treatment requires that "the apportionment of relief among class members" should take "appropriate account of differences among their claims." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("Paragraphs (C) and (D)").

As this Court concluded in granting preliminary approval, the Settlement "addresses the needs and circumstances of the member class, consisting of diverse groups of Air Force veterans of the Nation's most recent wars." *Johnson*, 2023 WL 6227678, at *8. Through the benefits outlined above, the Settlement does indeed secure relief that treats class members equitably, considering their diverse needs and circumstances.

### 2. Adequate Relief to the Class with Respect to Costs, Risks, and Delay of Trial and Appeal

Under Federal Civil Rule 23(e)(2)(C), the Court must consider whether the "relief provided for the class is adequate" by examining "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). When deciding whether to approve the Settlement, the Court balances the "complexity, expense and likely duration of litigation" against the benefits afforded the class.

*Grinnell*, 495 F.2d at 463. "As a general policy matter, federal courts favor settlement, especially in complex and large-scale disputes, so as to ensure compromise and conserve judicial and private resources." *In re Glob. Crossing*, 225 F.R.D. at 455 (collecting cases).

As Class Counsel suggest, "[t]his class action is complex." Doc. 106-1, at 21. "It litigates issues of systemic policy failures in the AFDRB's disposition of thousands of applications over the course of nearly two decades." *Id.* Moreover, "[c]onsiderable additional discovery, including expert discovery, would be required to resolve class claims challenging the AFDRB's policies, practices, and procedures—which have changed over the course of the class period." *Id.* at 21-22.

Class Counsel further represent that "[i]f this litigation were to continue, [they] would vigorously pursue such discovery, which could prove costly to all parties," and "protract litigation and delay relief for class members, some of whom received an adverse decision nearly two decades ago." *Id.* at 22.

Also, as noted by Plaintiffs' counsel, just "as . . . in *Kennedy* and *Manker*, Defendant continues to deny each and all of Plaintiffs' claims." *Id.* Although the class's claims "have merit and should prevail at trial, Class Counsel recognize[ ] that 'litigation's inherent uncertainties pos[e] manifest risk of an adverse judgment' that could deprive class members of relief." *Id.* (quoting *Kennedy*, 539 F.Supp.3d at 271). In contrast, this Settlement will provide "immediate relief to class members." *Id.* Given these considerations— the complexity, expense, and likely extended duration of further litigation—the Court finds support to grant approval of the Settlement as a fair, reasonable, and adequate solution.

### 3.  Response to Settlement Indicates It Is Fair, Reasonable, and Adequate

One "additional factor bearing on the adequacy and reasonableness of the settlement is the

reaction of class members." *Dubose v. Harris*, 82 F.R.D. 582, 589 (D. Conn. 1979). Within this Circuit, courts have observed that "[i]t is well settled" that the class's reaction to the settlement is "perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (quoting *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)).  It thus follows that, as stated in *Wal-Mart*, "the absence of substantial opposition is indicative of class approval" and "can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores*, 396 F.3d at 118 (citations omitted).  *See also Kennedy*, 539 F. Supp. 3d at 272-73 (When "no objections to the settlement have been made," "the reaction of the class to the settlement weighs heavily in the settlement's favor."); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) (In light of only eighteen objections out of a class of 27,883, "[t]he District Court properly concluded that this small number of objections weighed in favor of the settlement.") (citations omitted); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d at 425 (collecting cases) ("In fact, the lack of objections may well evidence the fairness of the Settlement.")

In the case at bar, as in *Kennedy* and *Manker*, no class member has objected to the settlement. Doc. 106-1, at 23.  Class Counsel implemented an extensive outreach strategy to provide adequate notification and opportunities for objections. *Id.* Said outreach contained a link to the Settlement Website to allow class members or their advocates to learn the details of the case and make objections. *Id.*  In addition, Class Counsel indicated that they "circulated the link to the Settlement Website" through "posts on veteran community pages on social media" and "paid advertisements on Facebook and Instagram." *Id.*  The Settlement Website contained information on how to object in the "Frequently Asked Questions" section and posted the deadline for objections

on the "Key Dates" page, ensuring that the process was understandable to all class members who visited the website. *Id.*

As Attorney Michael J. Wishnie attested in detail in his Declaration [Doc. 106-2], the Settlement Website, Class Notice, and Stipulation and Agreement of Settlement were distributed extensively to veterans organizations, the media, and elected officials; so they in turn could share those documents widely to potential class members.

In light of Class Counsel's extensive outreach strategy, the lack of objections to the Settlement may be viewed as "indicative of [its]  adequacy," *Wal-Mart Stores*, 396 F.3d at 118, which weighs in favor of final approval,  *Maley*, 186 F. Supp. 2d 362.

### IV.  NOTICE OF SETTLEMENT GIVEN TO CLASS MEMBERS

### A.  Notice Satisfies Rule 23(e) and the Court's Orders

Federal Rule of Civil Procedure 23(e)(1)(B) mandates that with respect to proposed settlements of class actions, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal . . . ." Fed. R. Civ. P. 23(e)(1)(B).  Accepting for purposes of notice that the class members in this case would be bound by the Settlement, it is well established that "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart*, 396 F.3d at 113-14 (citations  marks omitted).  To be reasonable, "the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* at 114 (citations and internal quotation marks omitted).

Within this Circuit, notice to the class is evaluated under a standard of reasonableness in the

context of a Rule 23(b) class action.  For example, in *Handschu v. Special Services Division*, 787 F.2d 828 (2d Cir. 1986), the Second Circuit held that notice regarding a proposed class action settlement was adequate, stating:

> Notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections, and must express no opinion on the merits of the settlement. Subject to these requirements, however, the district court has virtually complete discretion as to the manner of giving notice to class members.

787 F.2d at 832–33 (citations and internal quotation marks omitted).  *See also Kennedy*, 539 F. Supp. 3d at 268 (same) (quoting *Handschu*, 787 F.2d at 832-33).

In order for there to be final approval of the settlement the notice must have "(i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the litigation, their right to object to the Settlement, and their right to appear at the Final Fairness Hearing; (iii) [been] reasonable and constituted due, adequate, and sufficient notice to all persons entitled to notice; and (iv) met all applicable requirements of the Federal Rules of Civil Procedure, and any other applicable law." *Kemp-DeLisser,* 2016 WL 6542707, at *4.

In the case at bar, as discussed *supra* and consistent with  Rule 23(e), due process, and the Court's prior preliminary ruling, Class Counsel distributed the Class Notice to provide the "best notice practicable under the circumstances," thereby preparing class members to make informed decisions regarding the Settlement.  *Johnson,* 2023 WL 6227678, at *12 . To ensure broad distribution of the Class Notice, the Court directed Class Counsel to follow the proposed "extensive outreach strategy" and concluded that the planned outreach would be "consistent with due process of law, and constitute[ ] due and sufficient notice of this Order and the Settlement to all persons

entitled thereto . . . in full compliance with the requirements of Rule 23." *Id.* at *12-13.

For the reasons that follow, Class Counsel's efforts proved successful, providing reasonable notice to all class members in accordance with Rule 23(e)(1) and Second Circuit precedent.

## B.  Counsel's Extensive Outreach Strategy Effectively Distributed Notice to the Class

In this action, Class Counsel implemented a multifaceted plan that constituted the best notice practicable under the circumstances. In fact, Class Counsel's notice efforts were similar to—and actually exceeded—the notice to the class upheld by the Second Circuit in *McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009), and *Handschu*, as well as those approved by this Court "without difficulty" in the *Kennedy* and *Manker* cases.  *See Manker*, No. 3:18-cv-372 (CSH), Doc. 219 (Ruling Approving Class Action Settlement), at 11-12.

In *McReynolds*, the Second Circuit approved a plan that included notice published in three newspapers, "conspicuously posted" in government field offices, provided to executive directors of foster care agencies that contracted with the city government, and "distributed to all the offices of all child welfare policy, legal and organizing groups known to plaintiffs' counsel." 588 F.3d at 797. In *Handschu*, counsel published notice in "several metropolitan New York newspapers" over a period of several weeks, which adequately notified class members of the potential settlement. 787 F.2d at 833.

In the case at bar, Class Counsel distributed notice more widely than in *McReynolds* or *Handschu* through veterans' organizations, traditional and social media, and elected officials. Just as plaintiffs' counsel contacted the executive directors of foster care agencies and child welfare groups in *McReynolds*, Class Counsel in this case reached out to trusted veterans advocates and organizations to distribute notice of the Settlement.

Additionally, Class Counsel modeled the notice plan in this litigation on the plan implemented in the prior *Kennedy* and *Manker* cases, which this Court determined to be "energetic and imaginative" and "reasonable in the circumstances." *Kennedy*, 539 F. Supp.3d at 269. In contacting sixty-seven Veterans Service Organizations ("VSOs"), veteran-focused legal and social services providers, and veteran-focused legal clinics, Class Counsel exceeded the outreach efforts taken in *Kennedy* and *Manker*. *See* Doc. 106-2 (Ex. 1, Wishnie Decl.), ¶¶ 5, 14. Of those organizations contacted, twenty-eight were VSOs representing a wide variety of veteran constituencies. *Id.* ¶ 5.

Multiple VSOs then, in turn, distributed the Class Notice to their members. *Id.* ¶¶ 5, 8. For example, Iraq and Afghanistan Veterans of America ("IAVA"), described by Class Counsel as "a trusted membership-based organization of veterans who most closely match the certified class definition," Doc. 106-1, at 26, shared information about the Settlement and a link to the Settlement Website with its 425,000 members through a blog post and social media engagement. Doc. 106-2, ¶ 10. In addition, IAVA shared this information through posts on X (formerly Twitter) on October 11, October 31, and November 7, 2023. *Id.* ¶ 11. This information was viewed more than 1,700 times in total, and "IAVA maintains an active X following of over 74,500 users." *Id.*

Furthermore, as part of a social-media outreach strategy, Class Counsel published and circulated X posts, including a link to the Settlement Website and information about the fairness hearing. *Id.* ¶¶ 21-22. These posts were widely shared by veterans' advocates, with numerous organizations performing their own social media outreach regarding the Settlement. *Id.* These social media efforts amplified the Class Notice and thus added legitimacy to Class Counsel's other outreach to veterans.

In fact, Class Counsel's social media strategy was "extensive" and "exceeded" the one employed in *Kennedy* or *Manker*. Doc. 106-1, at 26. In particular, Class Counsel used X, Reddit, Facebook, LinkedIn, Instagram, and Threads to distribute settlement information. Doc. 106-2, ¶ 21. In addition to posting on X and placing personal posts on LinkedIn and Threads, Class Counsel used Reddit to reach up to 478,400 users on forums directed at airmen, guardians (the term for Space Force members), and veterans. *Id.* ¶ 23. Class Counsel also conducted an extensive Facebook distribution campaign, posting to sixteen private Facebook groups for airmen, veterans, and their families, reaching up to 171,294 members. *Id.* ¶ 24.

In addition, Class Counsel purchased a targeted advertisement campaign on Facebook and Instagram. *Id.* ¶¶ 26-27. Through the use of Meta's targeted digital ad technology, the campaign was designed to maximize the number of users reached and prioritize class members, including those who identified as veterans of United States armed forces and those whose employment was affiliated with the Air Force or indicated veteran status.[7] *Id.* ¶ 28. The advertisement ran for one month, was shown 169,684 times on Facebook and Instagram, and reached an estimated 144,190 unique, targeted users by the end of the campaign on November 20, 2023. *Id.* ¶¶ 26-27; Doc. 106-5 (Ex. 4, Targeted Ad Campaign Information).

As the result of Class Counsel's efforts, a significant amount of interest and traffic emerged, demonstrating that the outreach plan was effective. Seven hundred sixty-seven unique visitors

---

[7]    Meta Platforms, Inc., d/b/a Meta, was  formerly named Facebook, Inc. *See, e.g.,* https://www.investopedia.com/articles/personal-finance/051815/top-11-companies-owned-facebook.asp#:~:text=Meta%2C%20the%20company%20that%20owns,which%20became%20Facebook's%20Messenger%20app. Meta is an American multinational technology conglomerate which owns and operates Facebook, Instagram, Threads, and WhatsApp, as well as other products and services.

viewed the Settlement Website, registering a total of 1,624 page views. Doc. 106-2, ¶ 30.  Visitors came from forty-six states and the District of Columbia, as well as one United States territory and sixteen countries outside of the United States during the period after Class Notice was distributed. *Id.*  Moreover, Class Counsel's settlement administrator, JND Legal Administration, responded to six email inquiries and twenty-two phone calls about the proposed settlement. *Id.* ¶ 31. Class Counsel created an email account (johnson.settlement@YLSclinics.org) to respond to inquiries about the proposed settlement from the press and class members and  responded to eight email inquiries.[8] *Id.* ¶ 33.

In addition, Class Counsel complied with the Court's order to continue engaging with traditional media in a manner reasonably calculated to notify class members across the country.  The media strategy that was employed—*i.e.*, issuing a joint press release with the Department of the Air Force, proactively contacting journalists, and responding to media inquiries—resulted in several news stories in both the mainstream and military press. Doc. 106-2, ¶¶ 19, 20.  *See also McReynolds*, 588 F.3d at 797 ("[F]orm and distribution of the Notice was sufficient" where the

_____

[8]  In comparison, the outreach efforts in *Manker* and *Kennedy* resulted in 998 and 2,687 unique website visitors, respectively. *See Manker v. Del Toro*, No. 3:18-CV-372 (D. Conn. Dec. 9, 2021), Doc. 217-2 (Affidavit of Class Counsel), ¶ 37; *Kennedy*, 539 F. Supp. 3d at 269. The *Manker* settlement administrator responded to thirty-one emails and eighteen phone calls. *Manker*, Doc. 217-2, ¶ 38.

As of September 30, 2020, the Department of Veteran Affairs indicated that there were approximately 8.6 million Army veterans and 6.2 million Navy and Marine Corps veterans, compared to approximately 3.4 million Air Force veterans. *See* Nat'l Ctr. for Veterans Analysis and Statistics, U.S. Department of Veterans Affairs,  www.va.gov/vetdata/veteran_population.asp (select "Veteran Population," "Population Tables," then "Branch of Service"). As Class Counsel represent, "[i]n light of the small size of the Air Force veteran population compared to that of the Army and Navy, traffic to the Settlement Website here compares favorably." Doc. 106-1, at 27 n.4.

Notice was published in three newspapers likely read by class members and supplemented by outreach.); *Handschu*, 787 F.2d at 833 ("[P]ublication over a period of weeks in several metropolitan New York newspapers" was adequate to serve notice to class members.). Moreover, this media strategy resulted in coverage by publications targeting the military and veteran population—including Air Force Times, Military.com, Air & Space Forces Magazine, and Mirage News. Doc. 106-2, ¶ 20. This media coverage placed class members on notice of a potential settlement and accompanying Class Notice.

Upon receiving the Court's preliminary approval, Class Counsel sent a joint press release to 271 reporters. *Id.* ¶ 19. This outreach far exceeded the roughly 180 reporters whom counsel previously contacted in *Manker*. *See Manker v. Del Toro*, No. 3:18-CV-372 (D. Conn. Dec. 9, 2021), Doc. 217-2 (Affidavit of Class Counsel), ¶ 26. Of the 271 reporters, Class Counsel sent focused outreach to ten who had previously covered this case, *Manker*, or *Kennedy*, or who had otherwise covered veterans issues. Doc. 106-2, ¶ 19. As the result of this outreach, four publications and one television news program reported on the Settlement's preliminary approval and shared information about the upcoming fairness hearing. *Id.* ¶ 20.

Finally, Class Counsel worked with elected officials to distribute the Class Notice to the United States Congress and its members' constituents. Such distribution expanded well beyond such measures taken in *McReynolds* and *Handschu*, and mirrored those undertaken in *Kennedy* and *Manker*. In particular, Class Counsel worked with Representative Chrissy Houlahan (D-CO), a member of the House Armed Services Committee (which has jurisdiction over the AFDRB), and Senator Richard Blumenthal (D-CT), a member of the Senate Armed Services Committee and of the Senate Veterans Affairs Committee, to draft and distribute two "Dear Colleague" letters to the

entirety of the United States House of Representatives and the Democrats of the United States Senate.[9] *Id.* ¶ 29; Doc. 106-4, at 2-5 (letters dated Oct. 19, 2023, and October 23, 2023). These letters encouraged members of both chambers of Congress to advise their district offices and constituent services staff of the Settlement and the opportunity to object. Class Counsel's efforts with respect to elected officials ensured that information about the Settlement could reach veterans through said officials' ties to their communities.

**C. Counsel's Strategy Was the Best Practicable Method to Distribute the Class Notice**

As described above, the outreach reasonably constituted the best practicable method for distributing the Class Notice for three reasons. First, it provided notice to as-yet unidentified class members. Second, it employed different methods to provide notice to class members. Third, it provided distribution of the notice over an extended period of time.

As to unidentified class members, the Settlement provided notice by publication and outreach. Said class members have not yet applied for a discharge upgrade, and therefore their addresses and contact information are unknown to the parties. In a Rule 23(b)(2) class action, "notice to a representative class membership may be considered sufficient." *Handschu*, 787 F.2d at 833. Courts in this Circuit have reasoned that "[t]o the extent . . . that individual members cannot be identified, notice by publication is sufficient." *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 314 (W.D.N.Y. 2016). By distributing notice as described above, Class Counsel notified a representative class membership.

Furthermore, in utilizing a variety of notice methods, the outreach plan was robust and

---

[9] A "Dear Colleague" letter is written by an individual member of Congress to notify that official's colleagues of an issue important to constituents.

diverse. Because class members are geographically disparate and differently situated, Class Counsel

used several forms of outreach to reach as many class members as possible.  *See, e.g., McReynolds*,

588 F.3d at 797 (ordering notice by publication and outreach). This strategy ensured that potential

class members did not miss information on the Settlement simply because they did not consume one

type of media.

Finally, the timing of the notice was essential.  Class Counsel immediately began publicizing

the Settlement following preliminary approval to ensure that class members would have sufficient

time to submit any objections. Class Counsel's outreach then continued until November 20, 2023,

after the window for objections had closed.  Said outreach included efforts with community partners

to ensure that the Class Notice would percolate through veterans' networks and reach class

members. This expansive time period allowed for the Class Notice to reach class members who were

less regularly connected to veteran organizations and community partners, maximizing the

likelihood that they would receive the Class Notice.

All in all, Class Counsel exceeded the Second Circuit's minimum notice requirement that

a representative segment of the class receive notice.  The Court thus concludes that Class Counsel's

methods of distributing Class Notice—relying on VSOs, legal and social services providers,

traditional and social media, and elected officials—constituted the best practicable notice plan to

reach as many class members as possible.

**D.  Notice Adequately Advised Class Members of the Settlement's Terms and of Their Right
to Object or Appear at the Fairness Hearing**

To facilitate the class members' opportunity to review the Settlement's contents, Class

Counsel created a website, https://www.johnsonairforcesettlement.com, providing 24-hour access

for members to learn about the Settlement's terms, the deadline to object, and the contents of the

important documents, such as the Stipulation and Agreement of Settlement and Class Notice. Doc. 106-2, ¶¶ 31-32; Doc. 106-6, ¶¶ 6-8. Through JND Legal Administration, an experienced settlement administrator, Class Counsel also established a telephone hotline and email services to respond to inquiries regarding the Settlement. Doc. 106-2, ¶¶ 31-32; Doc. 106-6, ¶ 11-14.

In total, in addition to materials regarding the Settlement Agreement and Class Notice, communications to VSOs and legal/social services providers included the link to the Settlement Website, facilitating distribution of all Settlement materials to these organizations' members. Doc. 106-2, ¶¶ 5, 14. Moreover, Class Counsel's social media outreach often contained a link to the Settlement Website as well, thus informing class members about the fairness hearing and how to make an objection. *Id.* ¶ 21. The targeted ad campaign directed users to the Settlement Website when they clicked on the ad for more information. *Id.* ¶ 27.

In addition, the "Dear Colleague" letters distributed in the United States House and Senate contained information about the Settlement Website, the fairness hearing, and the process of submitting objections or comments. *Id.* ¶ 29. Representatives and Senators were encouraged to distribute this information to their constituents. *Id.* Finally, Class Counsel provided traditional media that reported on the Settlement's preliminary approval with the date and time of the fairness hearing, along with a link to the Settlement Website. *Id.* ¶ 19. The totality of these efforts ensured that information about the Settlement, fairness hearing, and opportunity to object was circulated to class members, adequately advising them about the terms of the Settlement and their right to object to it.

Because Class Counsel's notice distribution has adequately met the standards outlined in *Kemp-DeLisser* and the Court's orders, the notice was "due, adequate, and sufficient," 2016 WL 6542707, at *4, under the Due Process Clause and Rule 23(e) of the Federal Rules of Civil

Procedure.

## V.  CONCLUSION – FINAL APPROVAL OF THE SETTLEMENT

In accordance with Federal Rule of Civil Procedure 23(e), applicable case law, and the orders of this Court, the proposed Settlement Agreement fairly, reasonably, and adequately resolves the disputes in this class action. Procedurally, the Settlement was negotiated by experienced counsel at arms' length and extensively, both independently and with the assistance of Magistrate Judge Spector. Substantively, the Settlement inures to the benefit of the United States Air Force veterans at issue—those  suffering from traumatic brain injuries, post-traumatic stress disorder, and military sexual trauma who were improperly discharged less-than-Honorably and whose applications for discharge upgrades have been denied or who have not yet applied for upgrades.[10]  By reforming the process by which the AFDRB considers discharge applications, the Settlement Agreement confers substantial and  important benefits on thousands of afflicted Air Force veterans, treating all class members "equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D).  Moreover, by resolving the matter through joint agreement, the parties' Settlement avoids the risks, delays, and expense inherent in complex class action litigation, *id.* 23(e)(2)(C).  It thus follows that absent objection after sufficient Class Notice, the Settlement provides a just result for all class members.  For the reasons described above, the Settlement will be granted final approval.

Accordingly, the Court makes the following ORDER:

1.  Class Counsel's "Application for Final Settlement Approval" [Doc. 106] with respect

---

[10]  Specifically, these veterans include members and former members of the Air Force, Space Force, Air Force Reserve, and Air National Guard who served in the military during the Iraq and Afghanistan eras, defined as those with discharge dates from October 7, 2001 through the Effective Date of Settlement.

to the parties' joint "Stipulation and Agreement of Settlement" ("Settlement Agreement") [Doc. 92-1] is GRANTED.

2.   The provisions of the Settlement Agreement [Doc. 92-1] and the attached "Final Order and Judgment," as previously proposed by the parties  [Doc. 92-4] and now adopted by the Court, are hereby incorporated into and designated as part of this ORDER OF THE COURT.

3.   The Clerk of the Court is directed to close the file, without costs, except as provided in the Settlement Agreement.

4.   The Court retains jurisdiction over this discontinued action, in the event disputes arise over the implementation of the Settlement Agreement.

It is SO ORDERED.

Signed: New Haven, Connecticut
          June 11, 2024


*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

31